**STATE of Delaware**

v.

**Dale ROBINSON, Defendant.**

Superior Court of Delaware,
New Castle County.

Submitted Feb. 28, 1980.

Decided June 5, 1980.

Bartholomew J. Dalton and John T. Gandolfo (argued), Dept. of Justice, Wilmington, for the State.

Nancy Jane Mullen, Asst. Public Defender, Wilmington, for defendant.

LONGOBARDI, Judge.

Defendant has been indicted for an alleged violation of 11 *Del.C.* 1254(a), assault in a detention facility. By pretrial motions, Defendant has challenged the legality of the procedures whereby his indicting Grand Jury was selected as well as the manner in which the prosecution has proceeded thus far in the case. Specifically, Defendant claims that the Plan of the Superior Court of New Castle County for the random selection of grand and petit jurors (hereinafter referred to as the "Plan"), adopted pursuant to 10 *Del.C.* 4501 *et seq.* and effective September 13, 1976, is not adequately designed to achieve the objectives of § 4501 and § 4503 and does not comply with § 4504(b)(2). Therefore, according to Defendant, the instant indictment must be dismissed. As for the second motion, Defendant alleges that because his prosecution was initiated by an indictment and warrant under *Criminal Procedure Rule* 9, he was deprived of the right to a preliminary hearing which is afforded by *Rules* 5 and 5.1 to defendants whose prosecutions are initiated by an arrest. Defendant claims that the creation of a class of defendants who are not afforded a preliminary hearing violates his equal protection rights under the federal and Delaware Constitutions. As a result of these alleged violations, Defendant argues that either his indictment should be dismissed or, in the alternative, he should be granted a postindictment preliminary hearing. Having fully considered the briefs and contentions of counsel at oral argument, the Court is now prepared to rule on the pending motions.

I

Defendant's attack on the adequacy of the Plan for selection of jurors focuses primarily on three provisions of Chapter 45, Subchapter I, Title 10, set out in pertinent part below:

§ 4501. Declaration of policy.

It is the policy of the State that all litigants in state courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the county wherein the court convenes. It is further the policy of the State that all citizens shall have the opportunity to be considered for service on grand and petit juries in the courts of the State, and shall have an obligation to serve as jurors when summoned for that purpose.

§ 4503. Discrimination prohibited.

No citizen shall be excluded from service as a grand or petit juror in the courts of the State on account of race, color, religion, sex, national origin or economic status.

§ 4504. Plan for random jury selection.

\* \* \* \* \* \*

(b) Among other things, such plan shall:

\* \* \* \* \* \*

(2) Specify whether the names of prospective jurors shall be selected from the voter registration lists or the list of actual voters of each county. The plan shall prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect

the rights secured by § 4501 and § 4503 of this title.

Defendant correctly points out that the written Plan provides for selection of prospective jurors from the New Castle County voter registration list and that no other source is mentioned therein. Defendant argues that the written Plan does not expressly include a formal monitoring procedure to ascertain whether selection of prospective jurors from the voter registration list effectuates the policies declared in § 4501 and § 4503. The final factual basis for Defendant's grand jury attack lies in an undisputed set of statistical data concerning the relative proportions of whites and non-whites in the County's voting age population and in the prospective jury panels selected under the Plan. This statistical data is detailed *infra*. From these undisputed facts, Defendant advances two arguments concerning alleged inadequacies in the Plan *vis-à-vis* the statutory policies expressed in § 4501 and § 4503.

### A

Defendant's first argument is that the Plan is facially defective in two respects. First, Defendant argues that without an ongoing monitoring procedure there is no way to determine whether prospective jurors have been "selected . . . from a fair cross section of the county," § 4501, and without regard to "race, color, religion, sex, national origin or economic status," § 4503. While it is obvious that some kind of monitoring is necessary to ascertain whether the Plan is in fact achieving these statutory objectives, § 4504 (which deals with the specific requirements for written plans) does not expressly require that such monitoring procedures be included in the written Plan. Therefore, the Court rejects Defendant's claim that the Plan is facially defective because it contains no written provision concerning ongoing monitoring

procedures. Moreover, defense counsel admitted in the briefs and at oral argument that the statistics relied upon herein to show non-white representation in the various prospective jury panels were developed, maintained by and obtained from the Superior Court Administrator. The fact of the matter is that this Court has required its Administrator to maintain such statistics since the Plan's inception so that the Court can adequately monitor compliance with the statutory objectives. The fact that counsel was able to obtain the statistics upon which she relied in her brief attests to the monitoring process of the Court. Thus it is clear that Defendant's argument concerning the absence of adequate monitoring procedures is patently without merit.

The second aspect of Defendant's facial attack on the Plan concerns the requirement of § 4504(b)(2) for inclusion of an alternative source, in addition to voter lists, from which prospective jurors may be selected "where necessary to foster the policy and protect the rights secured by § 4501 and § 4503 of this title." As indicated earlier, the only source presently included in the Plan is the voter registration list. Defendant argues that the Plan violates § 4504(b)(2) because it fails to include an alternative source to supplement the voter registration list. This Court believes that Defendant has misread the statutory alternative source requirement. The statute does not unconditionally require inclusion of an alternative source. Rather, the alternative source mandate of § 4504(b)(2) becomes operative only "where necessary to foster" the policies of § 4501 and § 4503. In other words, it is only when the voter registration list fails to produce petit and grand juries which represent a fair cross section of the county that the statute requires development of and resort to an alternative selection source. *See United States v. Armsbury*, D.Or., 408 F.Supp. 1130, 1136 (1976).[1]

1. There are no reported Delaware cases construing the provisions of Title 10, Chapter 45, Subchapter I. However, the Court notes that the Delaware statutes were patterned after the Federal Jury Selection and Service Act, 28 *U.S.C.* 1861 *et seq.* In fact, many of the provisions in the Delaware statutes, including all provisions relevant to the instant case, are virtually identical to the corresponding provisions in the Federal Act. *E. g., compare* 10 *Del.C.*

Therefore, the Court holds that the Plan as written does not violate the alternative source mandate of § 4504(b)(2) unless it can be shown that the voter registration list does not in fact produce "a fair cross section of the county" or that the Plan's present exclusive reliance on the voter registration list in fact results in the discrimination prohibited by § 4503.

### B

This leads to consideration of Defendant's primary argument based exclusively on the aforementioned statistical data, that is, the Plan, in violation of § 4501, does not in fact result in selection of jurors from a fair cross section of the county and does result in an unfair representation of non-whites in violation of § 4503. Defendant relies exclusively on the Superior Court Administrator's statistical data concerning the representation of non-whites on the master jury wheel, the qualified jury wheel, the monthly petit jury panels and the composition of the grand jury.[2] The Defendant and the State do not dispute the accuracy of the Administrator's data. Consequently, the Court will accept this data in determining the merits of Defendant's motion.

At this point, a very brief description of the Plan's procedure for selection of jurors is in order. Initially, one percent of the names on the voter registration list are randomly selected by a computer. This is called the "master jury wheel." All persons on the master jury wheel are then required to complete qualification questionnaires and those found qualified are placed on the "qualified jury wheel." Thereafter, petit jurors are selected from the qualified jury wheel to serve on "monthly petit jury panels." During the months of June and December, a combined total of fifteen persons are selected from the qualified jury wheel and, if necessary, the master jury wheel to

serve as the grand jury for New Castle County. Although this description of the Plan's operation is somewhat simplified, it will suffice for present purposes.

The Administrator's data reveals the following relevant figures. The proportion of voting age non-whites in New Castle County according to the 1970 census was 11.9%. The jury selection statistical data must be compared to this figure in order to determine the adequacy of non-white representation under the Plan. The only figures presently available concerning composition of the master jury wheels and the qualified jury wheels are those for January and March, 1978. In each of these months, approximately 2,000 names were selected from the voter registration list and placed on the master jury wheel. Approximately 1,600 persons responded to the qualification questionnaires in each month. These questionnaires provide the initial information needed to determine proportional representation of various racial groups. In January, 1978, of those responding to the questionnaires, approximately 6% were non-white; in March, 1978, approximately 7% of the respondents were non-white. In each of these months, approximately 700 persons were found to be qualified and thus were placed on the qualified jury wheel. The proportional representation of non-whites on the qualified jury wheel was 7% in January and 8% in March, 1978.

The available data concerning the monthly petit jury panels is much more extensive covering all of 1978 and 1979. During these two years, approximately 200 persons per month were summoned for jury service and approximately 128 persons per month actually served as Superior Court jurors. During these two years, the proportion of non-whites summoned ranged from a low of 2%, a singular low, in September, 1978, to a

---

4504(b)(2) *with* 28 *U.S.C.* 1863(b)(2). Consequently, although federal cases construing the federal statutory provisions are not binding on this Court and although neither counsel has referred to a single federal case on this subject in their briefs, they will be referred to and relied upon herein where the Court finds them

persuasive or helpful in construing the Delaware provisions.

2. Defendant's initial argument attacks only the composition of the grand jury since the motion is addressed solely to dismissing the indictment.

high of 16% in June, 1978; the two year average of non-whites summoned was 8.65%. During these two years, the proportion of non-whites who served as Superior Court jurors ranged from a singular low of 2% in September, 1978, to highs of 17% in June, 1978, and December, 1979; the two year average of non-whites who served was 9.7% with 15 of the 24 months running from 9% to 17%.

### C

Defendant's claim that the Plan, as implemented, fails to comply with the requirements of §§ 4501, 4503 and 4504(b)(2) is based on the above listed statistics.[3] Defense counsel indicated in the briefs and emphasized at oral argument that the claim here is grounded entirely upon the Delaware statutory provisions; no claim of a constitutional violation has been asserted. Moreover, Defendant makes no claim of intentional discrimination either in the Plan's implementation or in the voter registration process. Therefore, the Court will look to Chapter 45, Subchapter I of Title 10 for the proper standard by which to judge Defendant's allegations of inadequate compliance.

10 *Del.C.* 4508(a) provides in pertinent part that:

> the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of *substantial failure* to comply with this subchapter in selecting the grand or petit jury. [Emphasis added].

In the Court's opinion, the emphasized language establishes the standard against which Defendant's claim must be measured. This language clearly indicates that the Legislature did not intend that jury selection plans be required to produce jury wheels and monthly jury panels which reflect a mirror image of the racial composition found in the voting aged population at large. *Compare* 28 *U.S.C.* 1867(d); *and see United States v. Armsbury*, above, 408 F.Supp. at 1143. It is obvious that the Legislature intended the Plan to be a reasonable effort to produce a composition of petit and grand juries which substantially represent a fair cross section of the county. Conversely, in order to obtain any relief under the statute,[4] Defendant must show that the Plan has *substantially* failed to achieve the statutory objectives. It is not enough to show simply that the Plan produces jury wheels and monthly jury panels with racial compositions that deviate from the county population norm as established by the census figures if the extent of such deviation cannot be properly characterized as "substantial."

In the context of allegations that a jury selection plan fails to meet the fair-cross-section standard of § 4501 because it produces substantial underrepresentation of a racial group, the Court must initially determine the composition of an identifiable racial class which has allegedly been singled out for distinct treatment. In other words, the Court must determine that some legally cognizable and distinct racial group exists in the community against which representation in the jury selection process may be measured to ascertain the extent of compliance with the policies of § 4501 and § 4503. *See United States v. Test*, 10th Cir., 550 F.2d 577, 585–86 (1976); *see also United States v. Armsbury*, above, 408 F.Supp. at 1134. While there can be no doubt that "whites" do constitute a cognizable racial group, the Court has some reservations about holding that the category of "non-

---

**3.** Defendant does not, nor could he complain that non-whites were underrepresented on his indicting grand jury since, as matter of fact non-whites constituted fully 20% of his grand jury. Defendant simply contends that the Plan violates the statute because there has been a lower percentage of non-whites on the jury wheels and monthly jury panels than the proportion of voting aged non-whites reflected in the 1970 census (*i. e.*, 11.9%).

**4.** Although Defendant's motion seeks dismissal of the indictment, the Court notes that § 4508(d) provides that if the Court finds there has been a substantial failure to comply with Chapter 45, Subchapter I, Title 10, the Court may *either* dismiss the indictment *or* stay the proceedings pending selection of a grand jury in conformity with the law.

whites" is also a single cognizable racial group. However, because the Court believes that the statistical data presented does not establish substantial underrepresentation of non-whites on the jury wheels and monthly jury panels, the Court will assume without deciding that such group is legally cognizable within the meaning of § 4501 and § 4503.

■ Short of total exclusion from jury selection of a racial group found in the county, this Court is of the opinion that no generally applicable litmus-like test can be formulated for determining the substantially of underrepresentation in all cases. Rather, the Court must look to the facts and circumstances in each case to ascertain whether the source from which prospective jurors are drawn produces a fairly representative reflection of the community *vis-á-vis* the particular racial group involved. Two basic approaches to this question have been developed in the federal courts under the comparable federal statutory provisions. Most of these courts have construed the statutory fair-cross-section standard as the functional equivalent of the constitutional "reasonably representative" standard developed under the Sixth Amendment. *United States v. Test*, above, 550 F.2d at 584. In order to establish a *prima facie* case under this standard, a defendant must prove: (1) the existence of a distinct and legally cognizable group in the community (discussed *supra*), (2) that such group has been systematically excluded from the jury selection process, and (3) that such exclusion has resulted in jury pools which fail to be reasonably representative of the community.[5] *Id.* at 585; *see also Duren v. Missouri*, 439 U.S. 357, 362, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). Other federal courts, in cases involving unsuccessful attacks on jury selection procedures, have assumed *arguendo* that statutory challenges are to be tested by a somewhat different standard referred to as the "absolute impact" standard.

*United States v. Test*, above, 550 F.2d at 588. This "standard is designed to evaluate 'the difference that would result in the absolute racial composition of the venire as the result of underrepresentation of blacks [or other cognizable groups] as voters.' " *Id.* n. 11 (citation omitted).

Under either of these two approaches, although the initial analysis is necessarily quantitative, the bottom line determination is a qualitative one. These standards are violated only where representational disparities are so great or pronounced that it cannot be said that the source from which jurors are drawn is "fairly" or "reasonably" representative of the community. *See id.* at 584–85. The principal difference between these two approaches lies in the statistical focal point from which the degree of representational disparity is measured. Under the constitutional standard, a comparison is made of the proportional representation of a group in the total population and in the pools of prospective jurors summoned for service over a statistically significant period of time. *See Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). Under the "absolute impact" standard, these proportional representation percentages are applied to hypothetical jury pools or panels of a given size to determine the actual number of jurors from a particular group that, on an average, appeared in the pools or panels and the ideal number which would have appeared if the composition of the pools or panels mirrored the general population. *See United States v. Test*, above, 550 F.2d at 588 n. 11.

D

■ Applying the constitutional standard to the case *sub judice*, the Court finds that the representation of non-whites resulting from the Plan's selection procedures is well within the range of variance which has been found acceptable in the federal cases.

5. The Court notes that under the constitutional standard, a greater degree of underrepresentation will generally be tolerated where, as here, selection methods are completely random than will be acceptable where a significant element of subjectivity is injected into the selection process, as in the "key-man" system of grand jury selection. *See, e. g., Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977).

The relevant statistics concerning non-white representation in the county population and at various stages of the jury selection process under the Plan, as detailed earlier, are as follows:

| | Proportion of Non-White | |
|---|---|---|
| Voting aged population | 11.9% | (1970 census) |
| Master jury wheel respondents | 6% to 7% | (January and March, 1978) |
| Qualified jury wheel members | 7% to 8% | (January and March, 1978) |
| Monthly jury panels: | | (1978–1979) |
| Persons summoned | 8.65% | |
| Persons who served | 9.7% | |

These figures show that the absolute extent of non-white underrepresentation in the selection process ranged from a high of 4.9% to 5.9% at the master jury wheel stage to a low of 2.2% to 3.25% at the monthly jury panel level. It is significant to note here that as the Plan's selection procedure progresses, the ratio of non-whites to whites increases so that the proportional representation of non-whites is greatest among the jurors who are ultimately selected for service. In any event, the underrepresentation range presented here is far below that found to be excessive in cases such as *Castaneda v. Partida*, above (79.1% Mexican-Americans in the general population, 39% on the grand jury lists), and *Turner v. Fouche*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970) (60% Negroes in the general population, 37% on the grand jury lists). *See also Whitus v. Georgia*, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967) (27.1% Negroes as taxpayers, 9.1% on grand jury lists), *Sims v. Georgia*, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967) (24.4% Negroes as taxpayers, 4.7% on grand jury lists), and *Jones v. Georgia*, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967) (19.7% Negroes as taxpayers, 5% on jury lists). The underrepresentation range in the instant case also compares quite favorably with cases involving unsuccessful attacks on jury selection procedures where similar or greater representational discrepancies have been shown. *E. g., Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) (26%

Negro males in the general population, 10% to 15% on jury venires); *see also United States v. Test*, above. On the basis of the preceding comparisons, the Court concludes that Defendant has failed to establish a *prima facie* case that the Plan as implemented substantially fails to comply with the statutory fair-cross-section requirement.

Application of the "absolute impact" standard to this case leads the Court to the same conclusion an under the constitutional standard. One point of reference for assessing the absolute impact which non-white underrepresentation has had in the jury selection process is the size of the average monthly jury panel from 1978 to 1979, *i.e.*, 200 persons. With a general population norm of 11.9%, a monthly jury panel would ideally have 23.8 non-white members. The actual non-white representation among those persons who were summoned and served on the monthly panels ranged from 8.65% to 9.7%. Reflecting these proportions, an average monthly jury panel would have from 17.3 to 19.4 non-white members. Consequently, the absolute impact of non-white underrepresentation under the plan at the monthly jury panel stage is a deviation of 4.4 to 6.5 persons out of 200. This deviation is not so qualitatively or quantitatively significant as to render the Plan's selection procedures invalid under the statute.

This conclusion is emphatically reinforced by applying the absolute impact standard at the grand jury level. The New Castle County grand jury has 15 members. Applying the norm of 11.9%, the ideal grand jury would have 1.8 non-white members. The actual average of non-white representation on the qualified jury wheel, the immediate source from which the grand jurors are selected, ranged from 7% to 8%. Reflecting these proportions, an average grand jury would have from 1.05 to 1.2 non-white members. Therefore, the absolute impact of non-white underrepresentation at the grand jury stage is a theoretical deviation of .6 to .75 persons out of 15. Moreover, and this is the crucial factor in this particular case in which Defendant's remedy could

be limited to merely supplying him a new grand jury panel, he was indicted by a grand jury which contained 3 non-whites for a proportional representation of 20%.[6] Lest this be considered an aberration, the January, 1979, grand jury had 4 non-whites for a proportional representation of 26.7% and the January, 1980, grand jury had 2 non-whites for a proportional representation of 13.3%. The facts themselves speak for the monitoring system of the Superior Court and the efficiency of the Plan and the speciousness of Defendant's argument that the grand jury which indicted him was underrepresented by non-whites.

### E

Based upon the foregoing analysis in Section I, A–D, the Court concludes that Defendant has failed to establish a *prima facie* case of substantial non-compliance by the Plan with the statutory fair-cross-section requirement. Therefore, Defendant's motion to dismiss based on alleged inadequacies in the Plan must be denied.

### II

■ The basis for the remaining defense motion is an alleged violation of Defendant's equal protection rights in that he has not been afforded a preliminary hearing. Without minutely detailing all of the various steps which may be taken during pretrial criminal procedures, it is sufficient for present purposes to note that prosecution of a defendant can, at the option of the prosecuting authorities, be instituted in two different manners. The most common method employed in initiating a prosecution is by arrest. Once a defendant has been arrested, *Criminal Procedure Rules* 5 and 5.1 come into effect and require that the defendant be granted an opportunity for a preliminary hearing at which the prosecutor must establish "probable cause to believe that an offense has been committed and that the defendant committed it . . .." *Rule* 5.1(a). Alternatively, the prosecutor may submit evidence of a criminal offense directly to the grand jury which, if it finds the requisite probable cause exists, returns an indictment against the defendant. Because both the preliminary hearing and the indictment serve to establish probable cause, it has been held that an indictment eliminates the need for a preliminary hearing. *Jenkins v. State*, Del.Supr., 305 A.2d 610 (1973); *Joy v. Superior Court*, Del. Supr., 298 A.2d 315 (1972); *see also Criminal Procedure Rule* 5(c). In *Jenkins*, the Supreme Court also observed that there is no constitutional due process right to a preliminary hearing. 305 A.2d at 614.

The alleged offense in this case occurred on or about August 30, 1979 at the Delaware Correctional Center where Defendant was and continues to be incarcerated on an unrelated conviction. Consequently, since there was no need to arrest Defendant on the present charge, the prosecutor proceeded to present its evidence directly to the grand jury which returned the indictment on or about October 30, 1979. In his Opening Brief at page 6, Defendant stated:

> The defendant is aware of no discernible pattern which has evolved with regard to the types of felony cases in which prosecution is instituted by indictment . . ., although the defendant believes that virtually all prosecutions for felonies committed within a state correctional facility are initiated by such method. It appears, however, that prosecutorial convenience is the principal common factor in such cases.

In any equal protection case, the threshold question to be decided is the standard of review which will be applied to the governmental action at issue. Normally, governmental action enjoys a presumption of constitutionality and "statutory classifications will be set aside only if no grounds can be conceived to justify them." *McDonald v. Board of Election Commissioners*, 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969). This is referred to as the "rational relationship" test. In cases where governmental action infringes upon a "fundamen-

---

**6.** Both parties have used the figure 27% but court records indicate the July, 1979, panel had 3 non-whites out of the 15 grand jurors which results in a 20% representation.

tal right," *e. g., Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), or involves use of a "suspect classification," *e. g., Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), the more rigorous "strict scrutiny" test has been applied. Under this test, the State is required to show that its classification scheme is necessary to promote a compelling state interest. Traditionally, equal protection analysis has been limited to the "minimum rationality" and the "strict scrutiny" tests. *See, e. g., Blake v. State*, Del.Super., 344 A.2d 260 (1975). However, in recent years the United States Supreme Court appears to have developed an intermediate standard of review primarily for cases involving classifications based on gender or illegitimacy. *E. g., Orr v. Orr*, 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979) (gender), and *Lalli v. Lalli*, 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978) (illegitimacy). Under this "mid-level scrutiny" the State's classifications "must serve important governmental objectives and must be substantially related to achievement of those objectives." *Orr v. Orr*, above, 440 U.S. at 279, 99 S.Ct. at 1111.

Defendant urges this Court to apply either "strict scrutiny" or "mid-level scrutiny" in the case at bar on account of "the importance of the rights [*i. e.*, right to a preliminary hearing] involved." Defendant's Opening Brief at 11. Defendant cites no Delaware or federal case law as authority on this point but refers the Court to the rather unique decision in *Hawkins v. Superior Court*, 22 Cal.3d 584, 150 Cal.Rptr. 435, 586 P.2d 916 (1978), which was grounded upon a construction of the California Constitution's equal protection clause. The *Hawkins* court determined that the preliminary hearing right and the procedural rights attendant thereto are "fundamental" and thus applied the "strict scrutiny" test in finding that denial of a postindictment preliminary hearing violated the California equal protection clause. Pronouncement of such a novel ruling, *i. e.*, that the right to a postindictment preliminary hearing is "fundamental" for equal protection purposes, appears taken from the context of Defendant's rights relative to other constitutional provisions such as right to counsel. But this Court finds the application of the fundamental right to counsel at preliminary hearings not the equivalent of a "fundamental" right to a preliminary hearing, especially in the context of Delaware law. Therefore, this Court declines to adopt the *Hawkins* rationale in deciding the instant case under either the federal or the Delaware Constitutions.

Because the Court finds that the Delaware procedural dichotomy regarding the availability of preliminary hearings involves neither a "suspect classification" nor the denial of a "fundamental right," the Court will assess Defendant's equal protection claim under the "rational relationship" test. The primary State interest sought to be advanced by our pretrial criminal procedures is to establish the existence of probable cause to hold a particular defendant for trial on a particular charge. This objective is achieved when a grand jury returns an indictment. Thereafter, the State may legitimately deny a preliminary hearing to the indicted defendant in the interest of *inter alia* minimizing pretrial demands on limited prosecutorial and judicial resources. Consequently, because the indictment-without-preliminary hearing procedure attacked herein is rationally related to the State's interest in obtaining a pretrial determination of probable cause without unnecessarily taxing the State's limited criminal justice administrative resources, the Court finds no merit in Defendant's equal protection claim. Defendant's second motion must also be denied.

### III

In conclusion, based upon the foregoing analysis, Defendant's motion to dismiss the indictment and his motion to dismiss the indictment or to require a preliminary hearing are hereby denied.

IT IS SO ORDERED.