Mark TURNBULL, as Guardian Ad Litem for Steven Turnbull, a minor, Plaintiff Below, Appellant,

v.

Kenneth FINK, Administrator of the Estate of Patricia Turnbull, Kenneth DeShields, and Delaware Authority for Regional Transit, Defendants Below, Appellees.

Lorraine J. SHENTON, Plaintiff Below, Appellant,

and

State Farm Mutual Automobile Insurance Company, Defendant Below, Appellant,

v.

DELAWARE ADMINISTRATION FOR REGIONAL TRANSIT, a/k/a DART, and Franklin Cooper, Jr., Defendants Below, Appellees.

Rosemarie MYERS and Jean Sachs, Plaintiffs Below, Appellants,

v.

DELAWARE ADMINISTRATION FOR REGIONAL TRANSIT, a/k/a DART, and Franklin Cooper, Jr., Defendants Below, Appellees.

The TRAVELERS INSURANCE CO., Vernalee P. Frey, and Virgil Frey, d/b/a Claymont Hardware and Supply, Plaintiffs Below, Appellants,

v.

DELAWARE ADMINISTRATION FOR REGIONAL TRANSIT, a Delaware corporation, and Franklin Cooper, Jr., Defendants Below, Appellees.

Virgil FREY, Vernalee Frey, his wife, Mark O. Frey, and V.V.M. Inc., t/a Claymont Hardware and Supply,

v.

DELAWARE ADMINISTRATION FOR REGIONAL TRANSIT, a/k/a DART, and Franklin Cooper, Jr., Defendants Below, Appellees.

No. 79, 1994.

Supreme Court of Delaware.

Submitted: June 21, 1995.

Decided: Oct. 26, 1995.

Eric M. Doroshow (argued), Martin J. Siegel and Julia Scott, Doroshow & Pasquale, Wilmington, for appellant Mark Turnbull as Guardian Ad Litem of Steven Turnbull.

Raymond E. Tomasetti, Jr. (argued), Newport, for appellant, Lorraine J. Shenton.

Jeffrey S. Marlin, Biggs & Battaglia, Wilmington, for appellants Mark O. Frey and V.V.M. Inc., t/a Claymont Hardware & Supply, and Vernalee Frey and Virgil Frey d/b/a Claymont Hardware.

William X. Moore, Jr., Roeberg, Moore & Assoc., Wilmington, for appellants Rosemarie Myers and Jean Sachs.

John D. Balaguer (argued), and Mary E. Sherlock, White & Williams, Wilmington for appellees DeShields, Cooper and DART.

Wayne A. Marvel, McCarter & English, Wilmington, for amicus curiae, Defense Counsel of Delaware.

Steven T. Davis, Bailey & Wetzel, P.A., Wilmington, for appellant Travelers Insurance Co.

Robert Jacobs, Jacobs & Crumplar, P.A., Wilmington, for amicus curiae Delaware Trial Lawyers Ass'n.

Carolyn H. deBernard, Law Offices of Robert Young, Dover, for appellant State Farm Insurance Co.

James J. Hanley, State of Delaware, Department of Justice, Wilmington, for State of Delaware, Department of Transportation.

Before VEASEY, C.J., WALSH, HOLLAND, HARTNETT, and BERGER, JJ., constituting the Court en Banc.

HARTNETT, Justice, for the majority.

This is an Interlocutory Appeal. The Plaintiffs–Appellants challenge pre-trial rulings of the Superior Court as to the extent to which the State waived its sovereign immunity by the purchase of commercial liability insurance covering accidents involving two buses operated by the Delaware Administration for Regional Transit ("DART"). The issue presented to the Superior Court was which statute controls these proceedings: 2 Del.C. § 1329, enacted by 66 Del.Laws C. 360 ("1989 Bond Act"), or 18 Del.C. § 6511. Title 2, Del.C. § 1329 waives the State's sovereign immunity, as to DART, up to a maximum of $300,000 for each occurrence, if DART has in place the commercial insurance coverage authorized to be purchased by the 1989 Bond Act. Title 18, Del.C. § 6511 waives sovereign immunity generally, up to the limit of insurance coverage, if there is in place the insurance authorized to be purchased under that Section.

The Superior Court held that, as between 18 Del.C. § 6511 and 2 Del.C. § 1329, Section 1329 was the more specific and later enacted statute and, therefore, its provisions control. Consequently, the Superior Court determined that 2 Del.C. § 1329 limits the State's waiver of sovereign immunity, as to accidents involving DART, to the lesser of the amount of applicable insurance coverage, or $300,000. The Superior Court held, alternatively, that because the applicable insurance coverage was not purchased as part of the State Insurance Coverage Program created by 18 Del.C. § 6511, the waiver of sovereign immunity provided by 18 Del.C. § 6511 could not apply.

The Superior Court granted the Plaintiffs'–Appellants' Motion for Certification of an Interlocutory Appeal and we accepted it pursuant to Supreme Court Rule 42(b). We then granted the motions of the Delaware Trial Lawyers Association and Defense Counsel of Delaware to file *amicus curiae* briefs in support of appellants' position.

We agree with the holding of the Superior Court. Accordingly, the interlocutory rulings of the Superior Court are affirmed.

## I.

Five actions were filed in the Superior Court seeking damages arising out of two accidents involving buses operated by DART, a State agency. The suits were consolidated in the Superior Court. At the time of the accidents, DART had primary liability insurance coverage with Reliance Insurance Company in the amount of $1 million per occurrence for which it had paid $609,113 as the annual premium. In addition, DART had an umbrella policy with General Star Indemnity Company in the amount of $5 million, for which it had paid an annual premium of $160,000. DART also carried excess coverage insurance with Crumb and Forster in the amount of $5 million, purchased with an annual premium of $40,000.[1]

The issue is whether 2 Del.C. § 1329, enacted by Section 68 of the 1989 Bond Act, which waives the sovereign immunity of the State up to a maximum of $300,000 for each occurrence, if there is applicable commercial insurance coverage, or 18 Del.C. § 6511 which waives sovereign immunity without limit, if there is applicable insurance coverage, controls in this instance.

## II.

Sovereign immunity has been a part of the law of Delaware throughout the State's history. This Court first considered the question of sovereign immunity as applied to a lawsuit brought against the State in the case of *Shellhorn & Hill, Inc. v. State,* 55 Del. 298, 187 A.2d 71 (1962). In that case, Justice Wolcott noted that sovereign immunity is not a judicially created doctrine, but rather, was part of the common law of England at the time of the American Revolution. The *Shellhorn* court took note of the long tradition of sovereign immunity enjoyed by English mon-

1. The wisdom or legality of the purchase of insurance in excess of the $300,000 per occurrence limit imposed by 13 Del.C. § 1329 is not before us.

archs and held that because sovereign immunity was unquestionably a part of the English common law prior to 1776, it was retained by Article 25 of the 1776 Constitution, which provided that the common law of England would remain in force in Delaware until altered by the newly formed Delaware General Assembly.

The 1792 Constitution, in Article I, § 9, directly addressed sovereign immunity, providing that "suits may be brought against the state, according to such regulations as shall be made by law." That language, present without alteration in all successive Delaware Constitutions, reinforced the constitutional basis for the doctrine of sovereign immunity in Delaware, subject, however, to waiver by the General Assembly. *Id.* at 74.

Sovereign immunity, therefore, is an absolute bar to liability claims against this State unless it is waived by the General Assembly. *Wilmington Housing Authority v. Williamson,* Del.Supr., 228 A.2d 782, 786 (1967).

### III.

All the parties agree that DART, as a state agency, is protected by the doctrine of sovereign immunity unless a waiver has occurred. Similarly, they assert that sovereign immunity, at least partially, has been waived as to the accidents that are the subject of this action, but they differ as to the extent of the waiver.[2] Appellants and *amici* assert that the doctrine of sovereign immunity has been waived, up to the amount of liability insurance coverage ($5 million), pursuant to 18 Del.C. § 6511. The other parties contend that 2 Del.C. § 1329, enacted by Section 68 of the 1989 Bond Act, which waives sovereign immunity only up to $300,000 per occurrence, applies.

2. There has been no claim that the insurance carriers agreed to assume any liability greater than the liability of the State.

3. 2 Del.C. § 1403(5) empowers the Delaware Transportation Authority "[t]o use funds avail-

### IV.

██ DART is governed by the Delaware Transportation Authority Act, 2 Del.C., Chapter 13.[3] Title 2, Del.C. § 1329, enacted by Section 68 of the 1989 Bond Act, addresses the issue of liability as to any service provided by the Delaware Transportation Authority ("Authority"). It states, in pertinent part:

Any operation, service or program provided by the Delaware Transportation Authority ... not covered by a general liability policy, self-insurance or other insurance policy as shall be legally established and funded by said Authority shall be covered and protected by the doctrine of sovereign immunity of the State which shall be applicable not only to the Authority but to each of its agencies, administrations, subsidiaries and each of their respective officers and employees ... In the event that insurance has been provided, such claim, including any award for damages or costs assessed against the Authority, its administrations, subsidiaries, officers or employees either individually or on behalf of their employer *shall not exceed the amount of said insurance covering the risk or loss or the amount of $300,000 whichever amount shall be lesser* for any and all claims arising out of a single occurrence (emphasis added).

This language states the general rule that DART, as a State agency operated by Authority, is protected against tort claims by the doctrine of sovereign immunity unless the General Assembly has waived it. Only a limited exception to this general rule of immunity is provided, and that exception has two requirements: there must be liability insurance and any recovery against DART cannot exceed the limit of $300,000 for a single occurrence.

Appellants, nevertheless, assert that 18 Del.C. § 6511 controls instead. It was enacted in 1970 as part of 18 Del.C., Chapter 65,

able in DART operations 'public' to cover the expenses, both capital and operating related to public transportation services provided by DART ..."

"Insurance for the Protection of the State." 18 Del.C. § 6511 states:

> The defense of sovereignty is waived and cannot and will not be asserted *as to any risk or loss covered by the state insurance coverage program,* whether same be covered by commercially procured insurance or by self-insurance, and every commercially procured insurance contract shall contain a provision to this effect, where appropriate (emphasis added).

Title 18, Del.C. § 6511 was intended to provide a method by which those injured by the State or its agencies would be compensated while, at the same time, protecting the State Treasury. Accordingly, that statute allows claims against the State only if insurance has been purchased pursuant to the "state insurance coverage program" ("State Insurance Coverage Program").

## V.

The Superior Court, in its decision, noted that although the defense of sovereign immunity is waivable under 18 Del.C. § 6511, that section provides for a waiver only as to risks covered by the State Insurance Coverage Program, a program that has never existed. It also held that 2 Del.C. § 1329, as the later enacted and more specific statute, superseded 18 Del.C. § 6511. It, therefore, correctly limited coverage in this case to $300,000 per occurrence, as is provided by 2 Del.C. § 1329. *Turnbull v. Fink, et al.,* Del.Super., C.A. No. 90C–10–135, Alford, J. (Feb. 17, 1994) (Memorandum Opinion), slip op. at 7, 1994 WL 89641. Delaware courts have on several occasions considered the applicability of 18 Del.C. § 6511 where it has been alleged that the doctrine of sovereign immunity has been waived because of the purchase of liability insurance by the State. It has been consistently concluded that the State Insurance Coverage Program mandated by 18 Del. C., Chapter 65, has never existed.

In *Raughley v. Department of Health & Social Services,* Del.Super., 274 A.2d 702, 704, (1971), the Superior Court held that 18 Del.C. § 6511 "is merely enabling [legislation], notwithstanding its mandatory direction." That court determined that "a fully developed and integrated program [of insurance] protecting both the State and the public was contemplated." The Superior Court in *Raughley* determined that because the State Insurance Coverage Program was not in existence, the waiver in 18 Del.C. § 6511 was not effective. Similarly, in *Pipkin v. Department of Highways & Transportation,* Del.Super., 316 A.2d 236 (1974), the Superior Court concluded, on a more limited basis, that without insurance coverage there could be no waiver.

In 1976 this Court first considered the meaning of 18 Del.C. § 6511 and the State Insurance Coverage Program in *Pajewski v. Perry,* Del.Supr., 363 A.2d 429 (1976). We determined that Title 18, Chapter 65, created "a comprehensive insurance program with implementing administrative provisions." *Id.* at 435. We also noted that Chapter 65 mandated that a Committee be formed to determine insurance coverage (Section 6502), specified the forms of coverage (Section 6503), authorized the Insurance Commissioner to promulgate rules and regulations necessary to carry out policy determinations (Section 6504), and formed a State Insurance Coverage Office (Section 6505). We also found that the provisions of the chapter are mandatory, because the word "shall" is used in every significant section. It was, therefore, concluded that 18 Del.C., Chapter 65, was more than mere enabling legislation and was a viable program. This Court, therefore, determined that the State could not escape liability merely by arguing that Section 6511 is inanimate "until vitalized by appropriation." *Id.* at 436. Instead, it held that sovereign immunity was presumptively waived, and that the burden would be "upon the State to provide all of the facts as to how the Committee met its responsibilities under 18 Del.C., Chapter 65 ... [including] whether self-insurance is or was feasible to provide coverage for such risk and the reason for no coverage." *Id.*

In 1985, however, in *Doe v. Cates,* Del. Supr., 499 A.2d 1175 (1985), we determined that the State had overcome the presumptive waiver of sovereign immunity provided in 18 Del.C. § 6511. We reached that conclusion because of the events that had transpired during the nine years since *Pajewski.* We

held that the Committee formed by 18 Del.C. § 6511 had made numerous good faith attempts to secure funding from the General Assembly to formulate a comprehensive insurance coverage plan, but to no avail. *Id.* at 1177–78. We noted that "it was never said that the Committee was responsible for ensuring that coverage actually exists. It was impossible for the Committee to create coverage without funding." *Id.* at 1177. We therefore found, as a matter of law, that the State had not waived its sovereign immunity because the State had never provided for the State Insurance Coverage Program as mandated by 18 Del.C. § 6511.

In *Sandt v. Delaware Solid Waste Authority,* Del.Supr., 640 A.2d 1030 (1994), we recently considered the issue of waiver of sovereign immunity as to the Delaware Solid Waste Authority ("Waste Authority"). We held that the General Assembly had expressly waived Waste Authority's sovereign immunity by enacting 7 Del.C. § 6406(a)(5) which gives Waste Authority the power to "[s]ue and be sued." We were therefore not called upon to rule on Sandt's alternative argument that Waste Authority's purchase of insurance waived its sovereign immunity under 18 Del.C. § 6511.

### VI.

Notwithstanding the $300,000 maximum limitation as to the waiver of sovereign immunity in 2 Del.C. § 1329, appellants claim that DART's purchase of insurance, with the maximum coverage of $5 million, constituted a waiver of sovereign immunity, up to that limit, pursuant to 18 Del.C. § 6511. It is not disputed that the insurance at issue was purchased pursuant to Section 67 of the 1989 Bond Act.

Section 67 of the 1989 Bond Act states:

*Transit operations:* The Delaware Transit Authority is hereby authorized to expand existing transit operations and the sum of Seven Hundred Fifty Thousand Dollars ($750,000) is hereby appropriated for that purpose. Said transit operations may consist of expanded rail or bus service or such other services which shall serve to promote commuter transit, to relieve road congestion and/or to provide such other traffic mitigation measures as shall be determined to be in the best interest of the State. The funds authorized by this section may be used for capital or operating costs, costs of insurance or bonding and any other costs reasonably related to provide the expanded transit operations described herein. *Any of the funds authorized herein and used for insurance purposes may be utilized as determined by the Delaware Transportation Authority to purchase a general liability or such other insurance policy or to participate in the State's self insurance fund to the extent necessary to provide for the potential liability exposure as shall be determined by the Delaware Insurance Determination Committee pursuant to Section 6501, Chapter 65 of the Delaware Code* (emphasis added).

Appellants' argument that 18 Del.C. § 6511 controls instead of 2 Del.C. § 1329 fails for several reasons.

As held in *Doe v. Cates,* 499 A.2d at 1175, 18 Del.C. § 6511 provides for the waiver of sovereign immunity only as to risks or losses covered by the State Insurance Coverage Program. It is not disputed that the insurance at issue was authorized to be purchased pursuant to § 67 of the 1989 Bond Act. Section 67 of the 1989 Bond Act, by its terms, does not provide for the procurement of insurance through the State Insurance Coverage Program created by 18 Del.C. § 6511. As the emphasized text of Section 67 provides, the Delaware Transit Authority is permitted to purchase insurance without utilizing the State Insurance Coverage Program. This is what was done. In light of the nonexistence of the State Insurance Coverage Program that could arrange for the purchase of insurance, the General Assembly obviously realized the need for DART to acquire its own insurance. The loss in question, therefore, cannot be covered by the non-existent State Insurance Coverage Program provided for by 18 Del.C. § 6511. *Doe v. Cates,* 499 A.2d at 1175.

■ As discussed previously, sovereign immunity is firmly rooted in both the common law and the Delaware Constitution. A

waiver of sovereign immunity must be a clear and specific act of the General Assembly. *Raughley v. Department of Health & Social Services,* Del.Super., 274 A.2d 702 (1971). Section 67 of the 1989 Bond Act is not a clear or specific waiver of sovereign immunity.

■ Appellants' interpretation of the combined effect of Section 68 of the 1989 Bond Act, which enacted 2 Del.C. § 1329 and 18 Del.C. § 6511 is also inconsistent and irreconcilable with the text of the 1989 Bond Act. Sections 67 and 68 of the 1989 Bond Act must be read together and harmonized, if possible. If they cannot be reconciled, the more specific provision must prevail over the general. *Hamilton v. State,* Del.Supr., 285 A.2d 807, 809 (1971); *State ex rel. Price v. 0.0673 Acres of Land,* Del.Supr., 224 A.2d 598, 602 (1966). When Sections 67 and 68 of the 1989 Bond Act are read together, as they must be, it is clear that the General Assembly, regardless of any other statute, intended that the sovereign immunity of the State would not apply as to DART only if DART had obtained insurance and, if so, the waiver would be limited to $300,000 for each occurrence, regardless of how much insurance was purchased by DART.

■ Lastly, the interpretation given to 18 Del.C. § 6511 by Appellants is irreconcilable with 2 Del.C. § 1329. Where possible, a court will attempt to harmonize two potentially conflicting statutes dealing with the same subject. If they cannot be reconciled, however, the specific statute must prevail over the general. *Hamilton v. State,* 285 A.2d at 809; 2B Sutherland Statutory Construction, § 51.04 (5th ed. 1992). Likewise, if the two acts are irreconcilable, the later enacted statute must prevail over the earlier. *State ex rel. State Highway Dept. v. George*

*F. Lang Co.,* 56 Del. 126, 191 A.2d 322 (1963). Title 2, Del.C. § 1329, imposes a $300,000 limit on the waiver of sovereign immunity as to DART. It is the more specific act and it is the later enacted. Consequently it must prevail over 18 Del.C. § 6511.

We, therefore, reject Appellants' argument that the General Assembly waived DART's sovereign immunity without any dollar limitation to the extent of DART's purchase of liability coverage.[4]

## VII.

Appellants also argue that 2 Del.C. § 1329 was unconstitutionally enacted and, even if validly enacted, deprives them of their constitutional equal protection and due process rights and their constitutional right to a jury trial and access to the courts.

Appellants incorrectly assert that sovereign immunity was conferred upon DART by 2 Del.C. § 1329. That statute merely reaffirmed sovereign immunity as it already existed under the Delaware Constitution. If we were to hold, as Appellants request, that Section 1329 is a nullity, the constitutional principle of sovereign immunity would deny all recovery to Appellants. We do not, however, find 2 Del.C. § 1329 to be unconstitutional.

### 1. *The Enactment of 2 Del.C. § 1329*

■ In this Court, Appellants raise for the first time a claim that Section 68 of the 1989 Bond Act, which enacted 2 Del.C. § 1329, is unconstitutional.[5] Specifically, they assert that the Act violated Article II, Section 16 of the Delaware Constitution because it contained more than one subject and that the subject "waiver of sovereign immunity" was not set forth in the title to the bill.[6]

**4.** Appellants' reliance upon *Kennerly v. State,* Del.Supr., 580 A.2d 561 (1990) is misplaced because the applicability of 18 Del.C. § 6511 was not at issue in that case. Nor did the *Kennerly* Court attempt to reconcile *Kennerly* with *Doe v. Cates,* Del.Supr., 499 A.2d at 1175 (1985).

**5.** Supr.Ct.R. 8 was not followed because this issue was first raised in this Court. We nevertheless consider the argument in the interests of justice and judicial economy. *Sandt v. Delaware Solid Waste Authority,* Del.Supr., 640 A.2d 1030, 1032 (1994).

**6.** The title to the 1989 Bond Act (66 Del.Laws C. 360) states: A BOND AND CAPITAL IMPROVEMENTS ACT OF THE STATE OF DELAWARE AND CERTAIN OF ITS AUTHORITIES AUTHORIZING THE ISSUANCE OF GENERAL OBLIGATION BONDS OF THE STATE AND REVENUE BONDS OF THE DELAWARE TRANSPORTATION AUTHORITY; APPROPRIATING FUNDS FROM THE FIRST STATE IMPROVEMENT FUND AND THE TRANSPORTATION TRUST FUND; PLEDGING DOCUMENT FEES TO THE TRANSPORTATION TRUST FUND TOGETHER WITH MOTOR FUEL TAXES AND MOTOR CARRIER REGISTRATION FEES; MAKING CERTAIN ADDITIONAL AMENDMENTS TO AND READOPTING TITLE 2, CHAPTER 13 AND CHAPTER 14; TRANSFERRING CERTAIN GENERAL OB-

The text of Article II § 16 of the Delaware Constitution precludes Appellant's argument. It states: "No bill or joint resolution, except bills appropriating money for public purposes, shall embrace more than one subject, which shall be expressed in its title." Delaware courts have consistently followed the "plain meaning rule" for construction of statutes or the Delaware Constitution. One formulation used by this Court in stating the "plain meaning rule" is: "In the absence of any ambiguity, the language of the statute must be regarded as conclusive·of the General Assembly's intent. The judicial role is then limited to an application of the literal meaning of the words." *State v. Cooper*, Del.Supr., 575 A.2d 1074, 1076 (1990) (citing *Evans v. State*, Del.Supr., 516 A.2d 477, 478 (1986); *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, Del.Supr., 492 A.2d 1242, 1246 (1985)). *See also In re Adoption of Swanson*, Del.Supr., 623 A.2d 1095 (1993); *Moses v. Bd. of Educ.*, Del.Supr., 602 A.2d 61 (1991).[7] It has been consistently followed in the construction of the Delaware Constitution. *Barron v. Kleinman*, Del.Supr., 550 A.2d 324, 326 (1988); *Marker v. State*, Del. Supr., 450 A.2d 397, 399 (1982); *Opinion of the Justices*, Del.Supr., 290 A.2d 645 (1972).

As noted by Millard H. Ruud in his article *No Law Shall Embrace More than One Subject*, 42 Minn.L.Rev. 389, 414–452 (1959), the text of the Delaware Constitution is more permissive than any other state constitution because it provides that a bill of the Delaware General Assembly which appropriates money for public purposes is free of the restraint that it be limited to one subject. ·As Professor Ruud points out, in 1958 18 states had adopted constitutional provisions specifically dealing with the limitation of contents of bills making appropriations—both general appropriations bills and other appropriation bills. Id. at 414–417. The Constitutions of seven of those 18 states (including Pennsylvania) expressly excepted only general appropriation bills from the one subject restriction. Id. at 414–417. There are only four states, including Delaware, in which a "one subject" limitation provision in the State's Constitution is exempted as to all appropriation bills. Id. at 416. Of these four states only the Delaware Constitution provides that any bill appropriating money for public purposes is excepted from the one-subject and title requirements. Id. at 416.

The 1989 Bond Act is clearly a bill appropriating money for public purposes, and its provision relating to the waiver of sovereign immunity in Section 68 relates to the insurance authorized to be purchased in the Act. The 1989 Bond Act is similar to the Annual Budget Act and differs only as to the number of appropriations and its source of funds. The 1989 Bond Act makes over 130 separate appropriations and the money appropriated has several sources including the General Fund, general obligation bonds, revenue bonds, funds made available from the repeal of prior appropriations not yet expended, and

---

LIGATION BOND AUTHORIZATIONS TO THE TRANSPORTATION TRUST FUND; TRANSFERRING CERTAIN DELAWARE TRANSPORTATION AUTHORITY BOND AUTHORIZATIONS TO THE TRANSPORTATION TRUST FUND; DEAUTHORIZING CERTAIN GENERAL OBLIGATION BONDS OF THE STATE AND CERTAIN BONDS OF THE DELAWARE TRANSPORTATION AUTHORITY AND CERTAIN AUTHORITY FOR GUARANTEED INDUSTRIAL REVENUE BONDS; REVERTING AND REPROGRAMMING CERTAIN SURPLUS FUNDS OF THE STATE AND REPROGRAMMING CERTAIN FUNDS OF THE DELAWARE TRANSPORTATION AUTHORITY CREATING CERTAIN FUNDS OF THE STATE, APPROPRIATING CERTAIN GENERAL AND SPECIAL FUNDS OF THE STATE AND THE DELAWARE TRANSPORTATION AUTHORITY; AUTHORIZING THE DEPARTMENT OF ADMINISTRATIVE SERVICES TO ALLOCATE STRIPPER WELL FUNDS TO CERTAIN ELIGIBLE CAPITAL IMPROVEMENTS AUTHORIZED IN THIS ACT; AMENDING CHAPTER 50, TITLE 29 OF THE DELAWARE CODE RELATING TO THE CREATION OF A DEVELOPMENT INCENTIVE FUND; AMENDING TITLE 29 OF THE DELAWARE CODE BY ADDING A NEW 34 RELATING TO THE ESTABLISHMENT OF A COMMISSION ON NATURAL AREAS AND OPEN SPACES; AMENDING TITLE 29, CHAPTER 65 OF THE DELAWARE CODE, REGARDING THE DEPARTMENT OF TRANSPORTATION CAPITAL PROGRAM

AUTHORIZATIONS AND ACCOUNTING SYSTEM, AMENDING TITLE 2, CHAPTER 14 OF THE DELAWARE CODE RELATING TO THE POWERS AND DUTIES OF THE DELAWARE TRANSPORTATION AUTHORITY; AMENDING VOLUMES 65, 66 AND 62 OF THE LAWS OF DELAWARE RELATING TO NATIONAL GUARD PROJECTS AND SHORELINE STABILIZATION; AMENDING TITLE 29, CHAPTER 74 OF THE DELAWARE CODE REGARDING PAYMENT OF DEBT SERVICE AND CHAPTER 83 REGARDING NOTIFICATION OF BOND ISSUANCES; AMENDING CHAPTER 51, TITLE 30 OF THE DELAWARE CODE REGARDING MUNICIPAL STREET AID; AMENDING CHAPTER 69, TITLE 29 OF THE DELAWARE CODE RELATING TO BID PROCEDURES; AMENDING TITLE 30, CHAPTER 30 OF THE DELAWARE CODE RELATING TO THE DELAWARE TRANSPORTATION AUTHORITY.

7. Although some commentators have criticized the use of the plain meaning rule, the text of a statute or Constitution is always the primary essential source of the meaning. *Alfieri v. Martelli*, Del.Supr., 647 A.2d 52, 54, n. 1 (1994).

certain special funds. As a bill appropriating money for public purposes, the 1989 Bond Act clearly falls within the exception in Article II, § 16 of Delaware Constitution. No other provision in the Delaware Constitution requires a one-subject limitation or a requirement for a title for a bill appropriating money for public purposes. There is, therefore, no requirement in the Delaware Constitution that the 1989 Bond Act be limited to one subject that is expressed in its title. *See Opinion of the Justices,* 57 Del. 19, 194 A.2d 855 (1963). The framers of the Delaware Constitution undoubtedly recognized, even in 1897, the difficulties in limiting an appropriation bill to one subject or setting forth its provisions in a title.

Appellants do not assert that they have been mislead or prejudiced by any deficiencies in the 1989 Bond Act. To the contrary, they are benefitted by the enactment of Section 68 that enacted 2 Del.C. § 1329 because it waives the constitutional doctrine of sovereign immunity, up to $300,000 per occurrence, if DART has in place the insurance coverage authorized to be purchased by the Act. Without Section 68, Appellants would not have the benefit of this waiver.

### 2. *Equal protection*

■ Appellants also argue that 2 Del.C. § 1329 unconstitutionally discriminates between injured persons based on whether their claims against DART are greater or less than $300,000.

■ In any equal protection case, the threshold issue is the standard of review to be applied to the government action in question. Usually, "governmental action enjoys a presumption of constitutionality and statutory classifications will be set aside only if no grounds can be conceived to justify them". *State v. Robinson,* Del.Super., 417 A.2d 953, 961 (1980), *quoting McDonald v. Board of Election Comm'rs,* 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739, 745 (1969); *see also Marine v. State,* Del.Supr., 607 A.2d 1185, 1206–1207 (1992), cert. den., —— U.S. ——, 113 S.Ct. 28, 120 L.Ed.2d 952 (1992). Under this "rational relationship" test, the person objecting to the state action bears the burden of proving the lack of rational justification.

■ In cases, however, where the state action infringes upon a "fundamental right" or creates a "suspect classification," the more rigorous "strict scrutiny" test will be applied. *Cf. Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (invalidating durational residency requirements for voting); *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (invalidating ban on interracial marriages). A governmental action survives strict scrutiny only where the state demonstrates that the test is narrowly tailored to advance a compelling government interest.

■ Between the levels of "rational basis" and "strict scrutiny" lies the "intermediate basis" test, a standard of review intended primarily for cases involving classifications based upon gender or illegitimacy. *See, e.g., Orr v. Orr,* 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979) (invalidating state statute providing that husbands, not wives, may be required to pay alimony upon divorce); *Lalli v. Lalli,* 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978) (involving illegitimacy). For governmental classifications to survive intermediate scrutiny, they must "serve important governmental objectives and [must be] substantially related to achievement of those objectives." *Orr v. Orr,* 440 U.S. at 279, 99 S.Ct. at 1111, 59 L.Ed.2d at 316.

■ Discrimination against those who have suffered economic injury generally does not implicate a suspect classification. *See, e.g., Marine,* 607 A.2d 1185. *See also* Ronald D. Nowak, *Treatise on Constitutional Law* § 8.3 (1992). Accordingly, this Court has applied the rational basis test to analyze legislation that creates economic classifications. *Cheswold Vol. Fire Co. v. Lambertson Const. Co.,* Del.Supr., 489 A.2d 413, 419 (1985) (holding that economic legislation must bear a rational relationship to a legitimate state purpose).

■ Title 2 Del.Code § 1329 creates no distinction among plaintiffs based upon classifications that are inherently suspect, such

as race, color, religion, or ancestry.[8] The application of this statute, therefore, does not deprive Appellants of a fundamental right, such as the right to vote. Nor does this case involve classifications based upon gender or illegitimacy. Instead, 2 Del.C. § 1329 creates nothing more than a economic distinction among potential plaintiffs.

Appellants suggest that this Court should adopt the minority rule embraced by a very few courts in other jurisdictions, which have applied augmented standards of scrutiny when determining the constitutionality of liability limitation statutes. Appellants cite *Brannigan v. Usitalo*, 134 N.H. 50, 587 A.2d 1232 (1991) and *Trujillo v. City of Albuquerque*, 110 N.M. 621, 798 P.2d 571 (1990).

■ Although we remain cognizant of the interests of tort victims in receiving redress for their injuries, we are unwilling to follow the minority rule that utilizes a heightened standard of scrutiny in reviewing statutes that create socioeconomic distinctions among plaintiffs. It is the rule in this state that absent suspect classification or alleged deprivations of a fundamental right, socioeconomic legislation need bear only a rational relationship to a legitimate state purpose. *Cheswold Vol. Fire Co. v. Lambertson Const. Co.*, 489 A.2d at 418. Therefore, we must follow the rational basis test.

Under the rational basis test, Appellants bear the burden of showing that there is no conceivable justification for the classification created by 2 Del.C. § 1329. They failed to meet that burden. Numerous justifications exist for limiting the recovery of potential plaintiffs in tort actions against the state. Among them is the need to protect the state treasury, maintain insurance premiums at a manageable level, and promote stability in the insurance market. *Murphy v. Edmonds*, 325 Md. 342, 601 A.2d 102, 115 (1992). Therefore, Appellants' equal protection argument is without merit.

### 3. *Right to jury trial*

■ *Amicus curiae*, the Delaware Trial Lawyers Association, argues that 2 Del.C.

§ 1329 is unconstitutional because it deprives plaintiffs of their right to adjudication by a jury.

■ The 1792 Delaware Constitution provided that "trial by jury shall be as heretofore." This language has appeared unchanged in four successive Delaware Constitutions and it was left unaltered when Article I, § 4 of the present Delaware Constitution was amended in 1984. "This Court and the other courts of Delaware have always construed that provision in the Delaware Constitution as '*guaranteeing the right to trial by jury as it existed at common law.*'" *Claudio v. State*, Del.Supr., 585 A.2d 1278, 1297 (1991) (quoting *Fountain v. State*, Del.Supr., 275 A.2d 251 (1971)). At common law and under the Delaware Constitution, lawsuits against the state have always been barred by the doctrine of sovereign immunity, unless waived by the General Assembly. The enactment of 2 Del.C. § 1329, therefore, represents a modification of the common law rule, by allowing lawsuits against DART through a limited waiver of sovereign immunity. Section 1329 does not deprive the petitioners of their existing right to a jury trial, rather, it creates a new right to sue. By enacting 2 Del.C. § 1329, the General Assembly exercised its power to create, and at the same time, limit the new cause of action. *Cf. Murphy v. Edmonds*, 325 Md. 342, 601 A.2d 102 (1992) (holding that a statutory damage cap does not violate the equal protection clause or the right to a jury trial) and *Etheridge v. Medical Center Hospitals*, 237 Va. 87, 376 S.E.2d 525 (1989) (holding that a statute limiting medical malpractice recovery does not violate due process, equal protection, or the right to a jury trial). Therefore, we reject the argument that Appellants are being denied their constitutional right to a jury trial.

### 4. *Due Process*

■ The *amicus* Delaware Trial Lawyers Association further argues that the limitation of liability contained in 2 Del.C. § 1329 is

---

**8.** Amicus curiae, the Delaware Trial Lawyers Association, concedes in its brief that the fact that some plaintiffs may not recover full compensation "is due to the extent of waiver of sovereign immunity under Title 18 Chapter 65 and not because of an arbitrary classification."

unconstitutional as it violates plaintiffs' due process rights and access to the courts as guaranteed by the Delaware Constitution. Article I § 9 of the Delaware Constitution states in part:

All courts shall be open; and every man for an injury done him in his reputation, person, movable or immovable possessions, shall have remedy by the due course of law, and justice administered according to the very right of the cause and the law of the land, without sale, denial, or unreasonable delay or expense; ...

The *amicus,* in effect, argues that Section 1329 might impermissibly deny full compensation to some plaintiffs. It also suggests that the liability limitation in that Section creates a "one department class, DART, which can limit its liability below the other State departments and agencies."

*Amicus* cites decisions from other jurisdictions that have held some types of legislative limitations on tort recovery to be a denial of due process. The issues in the cases cited by it, however, are distinguishable from the issue here because those cases all deal with statutes regulating recovery for private torts, rather than torts committed by the state. The failure to perceive this distinction is apparent in *amicus'* summary to its own argument:

The number of ramifications and permutations of this argument revolve around one, a common law right can be mitigated; two, where it is mitigated, a person should be afforded an equal remedy if the remedy is deprived; and three, that if there is no State purpose for this act, the limitation must be suspect.

The instant case does not involve the abrogation of a "common law right." As we have noted above, there could be no recovery in tort against the State at common law.

Furthermore, we reject *amicus'* argument that there is no "public function" for creating "a small infringed class" that is not permitted to recover damages to the extent of the State's insurance coverage. First, this argument is purely conclusory. 2 Del.C. § 1329 does not create "a small infringed class." Rather, it allows some recovery for all persons who can prove they were injured by a

negligent action of DART. The *quid pro quo* for the break with the common law and Delaware Constitutional doctrine of sovereign immunity was the limitation of liability under the new cause of action. Second, the limitation of liability serves the public function of making a recovery possible as to torts involving one State agency, DART, while protecting the State treasury and maintaining liability insurance premiums at an affordable level.

## VIII.

For the foregoing reasons, the pre-trial rulings of the Superior Court that 2 Del.C. § 1329, enacted by Section 68 of the 1989 Bond Act, applies to this lawsuit and that it limits any recovery to $300,000 per occurrence are AFFIRMED and this proceeding is REMANDED for further action.

HOLLAND, Justice, dissenting, with whom BERGER, J., joins:

The interlocutory judgments of the Superior Court which determined that 2 Del.C. § 1329, rather than 18 *Del.C.* § 6511, applies to these proceedings and limits any recovery to $300,000 per occurrence should be reversed because § 1329 is unconstitutional. The operative statutes are 18 *Del.C.* § 6511 and 2 *Del.C.* § 1309(20). The General Assembly's statutory authorization and funding of the commercial liability insurance policies, which are applicable to the claims in this case, constituted acts that waived the State's sovereign immunity up to the combined $11 million limits of those policies. *See* Del. Const. art. I, § 9; 18 *Del.C.* § 6511; 2 *Del.C.* § 1309(20); *Kennerly v. State,* Del.Supr., 580 A.2d 561 (1990).

### *Enactment of Section 1329 Violates Delaware Constitution*

The appellants contend that 2 *Del.C.* § 1329 is violative of the Delaware Constitution, *inter alia,* because it was enacted as Section 68 of the 1989 Bond and Capital Improvements Act ("1989 Bond Act"). 66 Del.Laws, Chapter 360. In support of that contention, the appellants assert that the title of the 1989 Bond Act gave no indication its

purpose was to alter the doctrine of sovereign immunity and that it was improper to include substantive legislation in an appropriation bill. The dispositive merit in this challenge to 2 *Del.C.* § 1329 is contained in three separate provisions that became a part of the Delaware Constitution simultaneously in 1897.

The first provision in the Delaware Constitution is Article II, § 16, which provides:

No bill or joint resolution, *except bills appropriating money for public purposes,* shall embrace more than one subject, which shall be expressed in its title.

Del. Const. art. II, § 16 (emphasis added). This provision sets forth the general "single-subject" and title rules, but specifically excepts from its purview appropriation bills, which, by their nature, cover more than a single subject, *i.e.,* the designation of funds to multiple recipients. *See Delaware Constitutional Debates 1897,* Vol. 2, p. 817.

The second provision in the Delaware Constitution that is relevant to this analysis is Article III, § 18, which provides, in part, that:

The Governor shall have power to disapprove of any item or items of any bill making appropriations of money, embracing distinct items, and the part or parts of the bill approved shall be the law, and the item or items of appropriation disapproved shall be void, unless repassed according to the rules and limitations prescribed for the passage of other bills, over the Executive veto.

Del. Const. art. III, § 18 (emphasis added). This provision authorizes a line-item veto power for the Governor, but only as to appropriation bills.

The final applicable constitutional provision is Article VIII, § 4, which provides:

No appropriation of the public money shall be made to, nor the bonds of this State be issued or loaned to any county, municipality or corporation, nor shall the credit of the State, by the guarantee or the endorsement of the bonds or other undertakings of any county, municipality or corporation, be pledged *otherwise than pursuant to an Act of the General Assembly,*

*passed with the concurrence of three fourths of all the members elected to each House.*

Del. Const. art. VIII, § 4 (emphasis added).

### Historical Context
### The Single–Subject and Title Rules

The two general provisions in Article II, § 16 of the Delaware Constitution, that a bill contain only one subject and that the title of the bill express its subject, are distinct requirements. *See* Millard H. Ruud, "No Law Shall Embrace More Than One Subject," Vol. XLII, *Minn.L.Rev.* 389, 391 (1958). Each has different historical origins. *Id.* Nevertheless, these two requirements are often combined in a single provision, such as Article II, § 16 of the Delaware Constitution, to achieve a common purpose. *Id.* Before examining the exception for appropriation bills, it is important to understand the history and purpose of the two general requirements.

The potential problem caused by an omnibus bill, which includes unrelated provisions on heterogeneous matters, is an uninformed legislative vote. This was recognized by the Romans. In 98 B.C., the *Lex Caecilia Didia* was enacted to prohibit the adoption of laws which contained unrelated provisions—the *lex satura. See* Luce, Legislative Procedures 548–549 (1922). The omnibus bill continued to be a cause for concern in colonial America prior to the Revolutionary War. *Id.* Consequently, the constitution of nearly every state now contains a general requirement that legislation be limited to a single subject. *Ruud,* "No Law Shall Embrace More Than One Subject," at 390.

The other general requirement in Article II, § 16, that the subject matter of a bill be expressed in its title, originated with the Georgia Constitution of 1798. *Id.* In 1795, the Georgia legislature passed the Yazoo Act, which made grants to private persons that were not reflected in the statute's title. *Ruud,* "No Law Shall Embrace More Than One Subject," at 390. The Georgia Constitution was amended in 1798. *Id.* The constitution of almost every state now requires that the title of a bill adequately express its subject matter. *Id.* These provisions are also intended to insure informed legislative

action, as the 1897 debates on the Delaware Constitution reflect:

> Oftentimes bills have been introduced in the Legislature with very harmless titles, but amendments have been added to those bills and when they have passed both Houses, they are entirely different from what they were originally.

*Delaware Constitutional Debates 1897*, Vol. 1, p. 264.

Consistent with the foregoing historical background, this Court has recognized that the two general requirements of Article II, § 16 were included in the Delaware Constitution of 1897 in order to "prevent deception of the general public and the members of the General Assembly by titles to bills which give no adequate information of the subject matter of the bills." *Opinion of the Justices*, 57 Del. 19, 194 A.2d 855, 856 (1963). The single-subject and title provisions in Article II, § 16 are intended to assure sufficient notice that "legislation, the content of which was inadequately brought to the public attention, or so-called sleeper legislation" does not slip through the General Assembly. *Id.* If a bill contains multiple subjects or the title of the bill is such that it would "trap the unwary into inaction," it must be struck down as a violation of this section of the Delaware Constitution. *In re the Opinion of the Justices*, 54 Del. 366, 177 A.2d 205, 208 (1962).

### Single–Subject and Title Rules Appropriation Bills as Limited Exception

Nevertheless, appropriation bills have traditionally been conditionally exempted from both of the general requirements, the single-subject and the title provisions, in state constitutions. *Id.* In view of the historical fear of omnibus legislation, which led to the constitutional proscriptions against bills with multiple subjects or nondescript titles, however, the exceptions for appropriation bills are always narrow. The condition for exemption is usually a limitation that the provi-

sions in an appropriation bill relate only to appropriations. *Id.*

While appropriation bills must contain no other *substantive* provisions than appropriations matters, this does not mean that an appropriation bill must merely be a list of monetary appropriations and respective recipients. *See Commonwealth v. Gregg*, 161 Pa. 582, 29 A. 297 (1894). Rather, appropriation bills may contain substantive language *which relates to the specific appropriations in the appropriation bill*. Such language may be found to be "conditional" or "incidental" to an appropriation and, therefore, properly included in an appropriation bill. *See Opinion of the Justices*, Del.Supr., 306 A.2d 720 (1973).[9] Factors which indicate that language in an appropriation bill is *not* merely "conditional" or "incidental," but rather is improperly substantive are: first, the provision is not germane to any appropriation in the appropriation bill; second, the provision amends or repeals an already existing law; and third, the provision is permanent in nature, extending beyond the life of the appropriation act.[10] *See Ruud*, "No Law Shall Embrace More Than One Subject," Vol. XLII, *Minn.L.Rev.* 389, 423–429 (1958); *Brown v. Firestone*, Fla.Supr., 382 So.2d 654, 664 (1980).

If an appropriation act contains substantive, non-financial legislation, it then becomes precisely the kind of omnibus bill the single-subject and title rules were meant to prohibit.[11] *See Ruud*, "No Law Shall Embrace More Than One Subject," Vol. XLII, *Minn. L.Rev.* 389 (1958). Accordingly, an appropriation act is an improper place for an enactment of matters unrelated to appropriations.[12] *Id.* Otherwise, the purpose behind the single-subject and title rules would be meaningless, since they could be circumvented simply by putting a substantive change into legislation otherwise primarily devoted to appropriations. *Id.* Consequently, those

---

**9.** *See also Attorney General of Pennsylvania Opinion No. 78–16*, 1978 Pa. AG LEXIS 18, at *7–9 (discussing cases).

**10.** *See Attorney General of Pennsylvania Opinion No. 78–16*, 1978 Pa. AG LEXIS 18, at *9–20.

**11.** *See, e.g., Attorney General of Pennsylvania Opinion No. 78–16*, 1978 Pa. AG LEXIS 18, at *6.

**12.** *See also Dept. of Education v. Lewis*, Fla. Supr., 416 So.2d 455, 459 (1982).

courts which have considered the issue all conclude:

> While under the Constitution general appropriation bills are exempted from the general constitutional provision which requires that all bills must contain but one subject, which must be clearly expressed in the title, it does not follow that general laws may be amended, modified, or repealed by a general appropriation act under such a general title.

See, e.g., State v. Cutler, 34 Utah 99, 95 P. 1071, 1072 (1908).

In Ruud's authoritative analysis of the one-subject rule, he reaches that same conclusion rhetorically regarding the exemption in Article II, § 16 of the Delaware Constitution:

> Delaware, making what seems the broadest exception, excepts "bills appropriating money for public purposes." A textual interpretation could lead to the conclusion that any act appropriating money, whether a general or special appropriations act, could contain any number of subjects. The question would be raised, though, whether acts containing more than appropriations and related provisions remain "bills appropriating money for public purposes." Doesn't the exception impose a limitation on the bill that it only appropriate money? Remarkably, no Delaware case dealing with this question was found.

Ruud, "No Law Shall Embrace More Than One Subject," at 434.

The foregoing conclusion by Ruud, that the exemption from the one-subject and title requirements in the Delaware Constitution for appropriation bills limits such legislation to appropriations, is compelled by an examination of the history and context in which Article II, § 16 of the Delaware Constitution was

adopted. During the debates on the 1897 Delaware Constitution, Edward G. Bradford proposed that appropriation bills be excluded from the constitutional provision which provided that no bill should embrace more than one subject expressed in its title (the single-subject and title rules):

> Mr. Chairman, I would move that section eighteen as adopted be reconsidered. In making that motion may I explain the reason why I make it? I find that in the Constitutions of the other states, and also according to what I consider sound reason, there ought to be an exception in that section of general appropriation bills. For instance, "No bill, except general appropriation bills, shall embrace more than one subject, which shall be expressed in its title, but a bill or joint resolution in violation of this provision shall not be invalidated thereby, only as to so much thereof as shall not be so expressed." *A general appropriation bill contains a great variety of items, which it would be impossible to fully set forth in any title. It seems to me, therefore, that, following the example in other states, it would be very well to except from that section general appropriation bills.*

*Delaware Constitutional Debates 1897*, Vol. 2, p. 817 (emphasis added).

During the discussion on this proposal, the Pennsylvania Constitution was cited as one of its origins and as persuasive authority for its adoption. See *Delaware Constitutional Debates 1897*, Vol. 4, pp. 2641–43. In 1894, three years prior to the Delaware constitutional debates, two similar provisions in the Pennsylvania Constitution,[13] along with a provision giving the governor line-item veto power over appropriations,[14] were interpret-

---

13. Pa. Const. art. III, §§ 3, 11; Pa. Const. art. IV, § 16. *See also Attorney General of Pennsylvania Opinion No. 78–16*, 1978 Pa. AG LEXIS 18, * 6 (1978) (purpose of provisions is "to prevent the practice of passing legislation by log-rolling or by rider.").

14. The drafters of the 1897 Delaware Constitution emphasized the importance of the Governor's line-item-veto power over appropriation bills:

> Provisions in regard to his power to veto separate items over appropriation bills, have been

adopted into all the new Constitutions, and the absence of it in the Federal Constitution is a fact greatly to be lamented. But that, perhaps, is a little aside from the subject of this amendment which I want to discuss.

*Delaware Constitutional Debates 1897*, Vol. 1, p. 233. *See also Perry v. Decker*, Del.Supr., 457 A.2d 357, 360–61 (1983). The debates on the provision that became Article III, § 18 of the Delaware Constitution focused primarily on the number of votes necessary to override the Governor's veto. *Id.* at Vol. 1, pp. 225–243, 247–262, 264–284.

ed by the Pennsylvania Supreme Court to have the same purpose, *i.e.*, to prevent the passage of extraneous matters in appropriation bills. *Commonwealth v. Gregg,* 161 Pa. 582, 29 A. 297 (1894).[15] With the benefit of the Pennsylvania Supreme Court's interpretation of its constitutional provisions regarding: appropriation bills; the single-subject rule; and the line-item veto, the drafters of the Delaware Constitution understood that excluding appropriation bills from the single-subject rule meant that such bills would not contain substantive provisions other than appropriations matters.[16]

### Line–Item Veto
### Consistent Limited Exception

The narrow exemption for appropriation bills in Article II, § 16 is similar to the limited authorization for the gubernatorial line-item veto in Article III, § 18. In construing the latter provision, this Court has recognized the distinction between bills which have the fundamental purpose of appropriating money for public purposes, and bills which are fundamentally substantive in nature, but which also include an appropriation relating to the substantive issues. *See Perry v. Decker,* Del.Supr., 457 A.2d 357, 360–61 (1983); *Opinion of the Justices,* 58 Del. 475, 210 A.2d 852, 853–54 (1965). As to the former type of bill, the Governor has line-item veto power, but as to the latter, the Governor may only approve or veto the bill in its entirety. *Perry v. Decker,* 457 A.2d at 361–62; *Opinion of the Justices,* 210 A.2d at 854–55. The debates on the 1897 Delaware Constitution make this clear:

> The Governor shall have power to disapprove of any item or items of any bill, *making appropriations of money, embracing distinct items,* and the part or parts of the bill approved, shall be the law, and the item or items of appropriation disapproved shall be void unless repassed according to the rules and limitations prescribed for the passage of other bills over the Executive veto.

*Delaware Constitutional Debates 1897,* Vol. 1, p. 282 (emphasis added). Accordingly, this Court has interpreted the Governor's line-item veto power, as set forth in Article III, § 18 of the Delaware Constitution, to extend "only to a bill containing more than one appropriation and 'embracing distinct items,'" and not to "bills which contain only a single item of appropriation" among other substantive provisions. *Perry v. Decker,* 457 A.2d at 360.

### Limited Appropriation Exceptions
### Article II, § 16 and Article III, § 18

The provisions in Article II, § 16 and Article III, § 18 of the Delaware Constitution,

---

**15.** The Supreme Court of Pennsylvania discussed the purpose of such constitutional provisions:

> The only provision invoked here is section 15 of article 3: "The general appropriation bill shall embrace nothing but appropriations for the ordinary expenses of the executive, legislative and judicial departments of the commonwealth." etc. The history and purpose of that section are well known. *It was aimed at the objectionable practice of putting a measure of doubtful strength, on its own merits, into the general appropriations bill,—in* legislative phrase, *"tacking it on as a rider,"—in order to compel members to vote for it, or bring the wheels of government to a stop.* The same constitutional intent is embodied in section 16 of article 4, giving the governor power to disapprove separate items of appropriations bills. *It is the practice of thus forcing the passage of extraneous matters, not germane to the purpose of the bill itself, that was intended to be abolished.* As to general legislation, *the same object, among others, was secured by the provision of section 2 of article 3 that "no bill, except general appropriation bills, shall be passed, containing more than one subject."* General ap-

propriation bills, from their nature, usually cover a number of items, not all relating strictly to one subject. *They were therefore excepted from the requirement of section 2, and this exception necessitated the special section 15 relating to them. The object of both is the same.* *Commonwealth v. Gregg,* Pa.Supr., 29 A. 297, 297–98 (1894) (emphasis added).

**16.** The Pennsylvania Constitution was repeatedly referred to as a model by the drafters of the 1897 Delaware Constitution, especially with regard to provisions such as the governor's line-item veto power and the single-subject and title rules:

> In our great neighbor, Pennsylvania, here nearby whose Constitution was framed by a Convention composed of many of the ablest men of that Commonwealth, many of the ablest lawyers and statesmen were in that Convention which sat for about a year in 1874, I think, and which resulted in the Constitution which is now in force in Pennsylvania, and which I have before me, the provisions are substantially the same.
> *Delaware Constitutional Debates 1897,* Vol. 1, p. 234. *See also, id.,* Vol. 4, pp. 2641–43.

when viewed in historical context and read in *para materia,* reflect that *to be* an appropriation bill the provisions in the legislation must all relate to appropriations. *See Perry v. Decker,* Del.Supr., 457 A.2d 357, 360–62 (1983). The purpose of exempting appropriation bills from the single-subject and title rules of Article II, § 16 was to allow appropriation bills to designate money for more than one purpose without running afoul of the constitutional mandate that a bill embrace only the one subject expressed in its title. *See Delaware Constitutional Debates 1897,* Vol. 2, pp. 817–820, 2475–76; Vol. 4, pp. 2641–43, 2871. The exception for appropriation bills in Article II, § 16 was *not* intended to allow substantive provisions other than money appropriations to be included in appropriation bills.

Similarly, the constitutional authority for a line-item veto in Article III, § 18 was limited to appropriation bills only, not legislation that related to substantive subjects and also included appropriations. *See Perry v. Decker,* 457 A.2d at 360–61. This Court has explained:

> The legislative process for the enactment of law established by our Constitution contemplates the formulating of proposed laws by the Houses of the General Assembly, and the submission of a proposed law to the Governor for his approval or disapproval. In effect, the Governor and the Houses of the General Assembly are a legislative team, but each has separate and distinct functions in the enactment of laws. It is the function of the Senate and House to agree upon the form and substance of a law, and, generally speaking, it is the function of the Governor to act as a check upon the final enactment of that law. In doing so, he must approve or disapprove it as a whole for he has no constitutional power to alter the content of a proposed law submitted to him, *except as to appropriations of money.*

*Opinion of the Justices,* 58 Del. 475, 210 A.2d 852, 855 (1965) (emphasis added). There was no veto power at all in the 1831 Delaware Constitution. *Delaware Constitutional Debates 1897,* Vol. 1, p. 233. The limited exception for a line-item veto in an appropriation bill in the 1897 Delaware Constitution permitted continued funding for other State operations, even in the absence of an agreement between the Governor and the General Assembly on the propriety of funding certain projects. *See* Daniel A. Farber and Philip P. Frickey, "The Jurisprudence of Public Choice," 65 *Tex.L.Rev.* 872, 922 (1987).

### 1989 Bond Act
### An Appropriations Bill

The central question thus becomes: was the 1989 Bond Act an appropriation bill? In a similar context, this Court has answered such a question affirmatively. An "[a]ct authorizing the State of Delaware to borrow money by issuing bonds and appropriating the moneys so borrowed to various agencies of the State" is an appropriation bill. *Opinion of the Justices,* Del.Supr., 306 A.2d 720, 721 (1973).

The 1989 Bond Act, in addition to authorizing the issuance of certain bonds, also was denominated by the General Assembly as "a supplemental appropriation of and in addition to the monies appropriated by the Fiscal Year 1989 Budget Act." 66 Del.Laws c. 360, § 5. Thus, the 1989 Bond Act, which included Section 68, was passed under the authority of Article VIII, § 4 of the Delaware Constitution. Accordingly, it was an appropriation bill. *See Opinion of the Justices,* 306 A.2d at 721; 66 Del.Laws c. 360.

### Section 68 of 1989 Bond Act
### Violates Appropriation Exception

Although Article II, § 16 of the Delaware Constitution specifically excludes appropriation bills from its purview, Section 68 of the 1989 Bond Act does not fall within that exclusion. The Constitutional Debates of 1897 reflect that the purpose of excluding *appropriation* bills from this section was to allow the legislature to make appropriations for many different purposes at once. *Delaware Constitutional Debates* 1897, Vol. 2, pp. 817–820; Vol. 4, pp. 2475–76, 2641–43 and 2871. Those debates also reflect the drafters of Article II, § 16 did not intend to permit the passage of "sleeper" legislation by including substantive non-monetary enactments in an appropriation bill. *Id.*

Section 68 of the 1989 Bond Act, through which 2 *Del.C.* § 1329 was enacted, is the type of legislation that was intended to be prevented by Article II, § 16 of the Delaware Constitution. Section 68 of the 1989 Bond Act amends Title 2 of the Delaware Code to waive the State's sovereign immunity for DART operations that are covered by commercial insurance and to impose a liability cap of $300,000. This is a substantive enactment of a permanent nature, which is improper in a bill otherwise completely devoted to "appropriating money for public purposes." Del. Const. art. II, § 16. There is also no indication in the title of the 1989 Bond Act that any change was to be made in the substantive law relating to sovereign immunity. Consequently, as a substantive change to the law of sovereign immunity, which was part of an appropriation bill, Section 68 violated Article II, § 16 of the Delaware Constitution.

### Section 68 Unconstitutional Severability Saves 1989 Bond Act

What are the ramifications of concluding that Section 68 of the 1989 Bond Act is unconstitutional? The other sections of the 1989 Bond Act are unaffected because of the severability provision in Section 73:

Section 73. *Severability.* If any section, part, phrase, or provision of this Act or the application thereof be held invalid by any court of competent jurisdiction, such judgment shall be confined in its operation to the section, part, phrase, provision, or application directly involved in the controversy in which such judgment shall have been rendered and shall not affect or impair the validity of the remainder of this Act or the application thereof.

Therefore, although Section 68 is unconstitutional, it does not invalidate the remaining provisions of the 1989 Bond Act. *See* 66 Del.Laws c. 360, § 73.

The conclusion that § 1329 is unconstitutional will come as no surprise to the State. The statutory $300,000 damage cap in Section 68 of the 1989 Bond Act became effective on July 12, 1988. 2 *Del.C.* § 1329. Nevertheless, the State has been concerned about the constitutionality of § 1329 since its enact-ment, as deposition testimony in the record reflects:

MR. MOORE: To try and get right to this, can you tell me why DART had essentially 11 million dollars' worth of liability coverage when there is a statutory cap limiting liability to $300,000?

MR. HILLIS: The cap wasn't tested in court. And through conversations with the Deputy Attorney General, it was felt that we did not want to have the opportunity to test that case and have it not upheld, and consequently, putting the assets of DART in jeopardy.

Thus, since the enactment of § 1329, DART has continued to purchase $11 million in primary and excess commercial liability insurance coverage.

### Delaware History Sovereign Immunity

The remaining question to be answered is whether the State has otherwise waived sovereign immunity, notwithstanding the invalid attempted waiver in § 1329. Sovereign immunity has been a part of the law of Delaware throughout the State's history. This Court first considered the question of sovereign immunity, as applied to a lawsuit brought against the State, in the case of *Shellhorn & Hill, Inc. v. State,* 55 Del. 298, 187 A.2d 71 (1962). In *Shellhorn,* this Court noted the long tradition of sovereign immunity enjoyed by English monarchs. *Id.* at 73–74. We concluded that sovereign immunity was unquestionably a part of the English common law prior to the American Revolution. *Id.* Accordingly, this Court held that sovereign immunity was retained by Article 25 of the 1776 Constitution, which provided that the common law of England would remain in force in Delaware until altered by the newly formed Delaware General Assembly. *Id.*

The 1792 Delaware Constitution directly addressed sovereign immunity in Article I, § 9, providing that "suits may be brought against the state, according to such regulations as shall be made by law." That language has been retained without alteration in all successive Delaware Constitutions and continues to be the basis for the doctrine of

sovereign immunity in Delaware. *Id.* Sovereign immunity, therefore, is an absolute bar to liability claims against the State of Delaware unless it is waived by the General Assembly. *Blair v. Anderson,* Del.Supr., 325 A.2d 94 (1974). *See also King v. State,* 57 Del. 562, 203 A.2d 74 (1964).

Despite the venerable historical background of sovereign immunity in Delaware, this Court has noted that "neither the certainty of the doctrine ... nor its longevity necessarily makes its application right or just." *Pajewski v. Perry,* Del.Supr., 363 A.2d 429, 433 (1976). In fact, Delaware's history reflects that its courts have applied the doctrine of sovereign immunity "with express reluctance and with an invitation to the General Assembly to remove it." *Id.* In *Shellhorn & Hill,* for example, after acknowledging that the Delaware Constitution "is no less binding on the courts than on any other branch of government" and, therefore, this Court could not refuse to enforce the doctrine of sovereign immunity when it was asserted, this Court then stated:

> We suggest to it [the General Assembly] as eminently proper for its consideration the desirability of permitting, at least to some extent, suits against the State for injuries caused by the torts of State employees. By the enactment of a general law permitting suit against the State under such conditions and circumstances as public policy make desirable, the basic rights and interests of both the State and the individual citizen would be protected.

*Shellhorn & Hill,* 187 A.2d at 74–75. One of the General Assembly's responses to this Court's entreaty in *Shellhorn & Hill* was embodied in an act entitled "Insurance for the Protection of the State." 18 *Del.C.* ch. 65.

### Sovereign Immunity Waived
### State Insurance Protection Act

This Court first considered the import of the State Insurance Protection Act in *Pajewski v. Perry,* Del.Supr., 363 A.2d 429 (1976). We determined that Title 18, Chapter 65, created "a comprehensive insurance program with implementing administrative provisions." *Id.* at 435. We also noted that Chapter 65: mandated that a Committee be formed to determine insurance coverage (Section 6502); specified the forms of coverage (Section 6503); authorized the Insurance Commissioner to promulgate rules and regulations necessary to carry out policy determinations (Section 6504); and formed a State Insurance Coverage Office (Section 6505). *Id.* We also found that the provisions of the chapter are mandatory, because the word "shall" is used in every significant section. *Id.*

This Court concluded, in *Pajewski,* that 18 *Del.C.* ch. 65 was more than mere enabling legislation. *Id.* This Court, therefore, held that the State could not escape liability merely by arguing that Section 6511 is inanimate "until it is vitalized by appropriation." *Id.* at 436.

> Section 6511 states flatly that the defense of sovereignty "is waived" and "will not be asserted." There is a limitation to that waiver, that is, it extends to "any risk or loss covered by the state insurance coverage program." To determine what risk or loss is covered by that program, we look to § 6502 which directs the Committee to insure *any* type of risk to which the State may be exposed. Such risk may be protected by commercially acquired insurance *or* through a self-insurance program but, *the point is, it must be protected.* In other words, the statutory plan, as we read it, contemplates a waiver of immunity co-extensive with the insurance program, which shall cover "any type of risk to which the State may be exposed."
>
> In the view we take here of the Statute, the State is not entitled to dismissal of the complaint merely by showing, as it has done, that there is neither commercial nor self-insurance covering the liability for the kind of tortious conduct alleged in the complaint. Immunity is presumptively waived by § 6511 and it is, therefore, incumbent upon the State to provide all of the facts as to how the Committee met its responsibilities under 18 *Del.C.* ch. 65.

*Pajewski v. Perry,* 363 A.2d at 436 (emphasis added).

In 1985, however, this Court determined that the State had rebutted the presumptive

waiver of sovereign immunity provided in 18 *Del.C.* § 6511. *Doe v. Cates,* Del.Supr., 499 A.2d 1175 (1985). We reached that conclusion because of the events that had transpired during the nine years since *Pajewski* had been decided. During that period of time, the Committee formed by 18 *Del.C.* ch. 65 had made numerous unsuccessful good faith attempts to secure funding from the General Assembly to formulate a comprehensive insurance coverage plan. *Id.* at 1177–79.

In *Cates,* this Court noted that "it was never said that the Committee was responsible for ensuring that coverage actually exists. It was impossible for the Committee to create coverage without funding." *Id.* at 1178. We therefore found, as a matter of law, that because the State had never *funded* the comprehensive State Insurance Coverage Program described in 18 *Del.C.* § 6511, the State had rebutted the presumption that it had waived sovereign immunity *pursuant to such a program. Id.* at 1179.

### *State Commercial Insurance Separate Authorization and Funding Constitutes Sovereign Immunity Waiver*

Nevertheless, for purposes of the case *sub judice,* the most significant holding in *Cates* is found in the last three paragraphs of that opinion. *Doe v. Cates,* Del.Supr., 499 A.2d 1175, 1183 (1985). Notwithstanding this Court's conclusion that the *comprehensive* insurance coverage plan contemplated by Chapter 65 of Title 18 had not been implemented despite the Committee's good faith efforts, this Court remanded the case "for discovery on the issue of whether the State has insurance coverage for the claim asserted. . . ." *Id.* This Court then held that "[i]t is clear the existence of *an* insurance policy covering [the] appellant['s] . . . claim could constitute a *waiver of sovereign immunity under 18 Del.C.* § *6511." Id.* (emphasis added).

This Court always has acknowledged that the State's sovereign immunity can be waived only by a legislative act. *Blair v. Anderson,* Del.Supr., 325 A.2d 94, 96 (1974). This Court also has stated, however, that "[i]t is clear . . . that waiver need not be made in express statutory language." *Id.* In *Blair,* for example, this Court held that "when the General Assembly authorizes a contract to be made it implicitly and necessarily waives immunity to suit for breach by the State of that contract." *Id. Accord Sandt v. Delaware Solid Waste Authority,* Del.Supr., 640 A.2d 1030 (1994).[17] Similarly, when the General Assembly authorizes and funds the purchase of a commercial liability insurance contract, it *acts* to waive sovereign immunity to the extent of the limits of the policy that is purchased. 2 *Del.C.* § 1309(20); 18 *Del.C.* ch. 65.

In a manner consistent with *Blair,* this Court subsequently explained and applied the alternative holding set forth at the end of the *Cates* decision. *Kennerly v. State,* Del. Supr., 580 A.2d 561 (1990). On behalf of this Court, Justice Walsh wrote:

> The doctrine of sovereign immunity is not favored in the law because its application tends to defeat claims and disputes on grounds other than the merits. *Pajewski v. Perry,* Del.Supr., 363 A.2d 429 (1976). The General Assembly's adoption of 18 *Del.C.* § 6511, which provides that the defense of sovereign immunity "cannot and will not be asserted" as to risks or loss covered by "commercially procured insurance," reflects a public policy that *liability insurance purchased with public funds must be considered as a source for payment of claims against State agencies. Doe v. Cates,* Del.Supr., 499 A.2d 1175, 1183 (1985). It may be that upon an enlarged record, or at trial, it can be demonstrated that the defense of sovereign immunity is valid because of the absence of liability insurance. On the present record, however, sufficient factual and legal doubt exists as to render inappropriate the grant of summary judgment based on that defense.

---

17. In *Sandt,* we held that the General Assembly had expressly waived the Delaware Solid Waste Authority's sovereign immunity by enacting 7 *Del.C.* § 6406(a)(5) which gives the Waste Authority the power to "[s]ue and be sued." We were therefore not called upon to rule on Sandt's alternative argument that the Waste Authority's purchase of insurance waived its sovereign immunity under 18 *Del.C.* § 6511.

*Kennerly v. State,* 580 A.2d at 566 (emphasis added).

Thus, the trilogy of decisions by this Court in *Pajewski, Cates,* and *Kennerly* followed an orderly and logical progression. In *Pajewski,* this Court held that the State could not defeat Section 6511's waiver of sovereign immunity by not funding a comprehensive insurance program. In *Cates,* this Court held that the existence of some commercial insurance coverage, without a comprehensive program for the State, *could* constitute a waiver of sovereign immunity pursuant to Section 6511. In *Kennerly,* this Court held that the existence of commercial insurance *would* constitute such a waiver. Consequently, the holdings in *Pajewski, Cates,* and *Kennerly* reflect consistent determinations by this Court that the unambiguous waiver of the State's sovereign immunity set forth in Section 6511 could not be rendered inoperative by the General Assembly's failure to fund a *comprehensive* insurance coverage program but, in fact, would be an effective waiver to the extent that the General Assembly *otherwise* authorized and funded the purchase of some commercial liability insurance coverage. *Kennerly v. State,* Del.Supr., 580 A.2d 561 (1990); *Doe v. Cates,* Del.Supr., 499 A.2d 1175 (1985); *Pajewski v. Perry,* Del.Supr., 363 A.2d 429 (1976).

It is logical to ask how commercial insurance could exist which would constitute a waiver of sovereign immunity under Section 6511, if a comprehensive State insurance coverage plan had never been promulgated? One answer to that question is found in Section 6510, which provides:

Existing insurance contracts and any renewals thereof may continue in full force and effect unless and until otherwise provided by the Director.

18 *Del.C.* § 6510. Thus, until a comprehensive State insurance plan became operative, the waiver of sovereign immunity in Section 6511 would be commensurate with the level of any "existing insurance contracts and any renewals thereof." *Id.*

Another basis for the existence of commercial liability insurance to protect the State would be specific legislation enacted subsequent to the adoption of Title 18 ch. 65. It was such specific subsequent legislation which authorized and funded the purchase of the commercial insurance that is at issue in this case.

### Sovereign Immunity Waived
### Commercial Insurance Acquired

The concerns that this Court expressed in *Pajewski* were known to the General Assembly in 1979 when the legislation establishing the Delaware Transportation Authority was enacted. 2 *Del.C.* ch. 13. In view of the nonexistence of a program that could arrange for the comprehensive purchase of commercial insurance for the benefit of all State agencies, the General Assembly expressly authorized the Delaware Transportation Authority to acquire its own insurance. In Section 1309(20) of Title 2, the General Assembly specifically gave the Delaware Transportation Authority power to

Procure insurance against any losses in connection with its property, operations or assets of any its administrations or subsidiaries in such amounts and from such insurers as it deems desirable.

2 *Del.C.* § 1309(20).

DART was established as a subsidiary corporation of the Delaware Transportation Authority on October 1, 1979, pursuant to 2 *Del.C.* § 1307(a), which grants the Delaware Transportation Authority the power to create subsidiary corporations. The parties agree that since DART was established in October, 1979, it has procured annually commercial liability insurance. The parties also agree that the money for the purchase of those commercial insurance policies has been appropriated by the General Assembly from the Delaware Transportation Authority fund.

With regard to the claims at issue in this proceeding, the record reflects that DART renewed a commercial liability policy with Reliance Insurance Company, effective July 1, 1988 to July 1, 1989, in the amount of one million dollars. That policy was renewed again on July 1, 1989. DART also renewed two $5 million umbrella and excess policies with other commercial carriers for the period of July 1, 1988 through July 1, 1990.

When the General Assembly authorized and funded the acquisition of commercial liability insurance policies by the Delaware Transportation Authority and its subsidiary DART, it *acted* to provide a method by which those injured by the State or its agencies will be compensated while, at the same time, protecting the State treasury. 2 *Del.C.* § 1309(20); 18 *Del.C.* ch. 65. The General Assembly recognized that it was logically inconsistent to purchase insurance and then allow a commercial carrier to assert the defense of sovereign immunity. 18 *Del.C.* § 6511. Permitting a commercial insurer to assert the defense of sovereign immunity would not only deny protection to those individuals who were injured by the State's negligence but, rather than protecting the State treasury, would mean that the public funds expended on premiums for commercial insurance had been wasted. The General Assembly's actions, read in *pari materia*, were intended to preclude such illogical results. 18 *Del.C.* ch. 65; 2 *Del.C.* § 1309(20).

### Conclusion

For the foregoing reasons, I respectfully dissent.