SUBURBAN TRUST AND SAVINGS BANK, an Illinois Savings Bank, Plaintiff,

v.

The UNIVERSITY OF DELAWARE, a corporation organized under the laws of the State of Delaware, Defendant.

Civil Action No. 94–665 MMS.

United States District Court, D. Delaware.

Dec. 29, 1995.

Frederick L. Cottrell, III, Esq., of Richards, Layton & Finger, Wilmington, Delaware; Of Counsel: Richard W. Burke, Esq., and Andrew D. James, Esq., of Burke, Warren & MacKay, P.C., Chicago, Illinois; attorneys for plaintiff.

Daniel F. Wolcott, Jr., Esq., and Linda S. Kranitz, Esq., of Potter Anderson & Corroon, Wilmington, Delaware; attorneys for defendant.

### OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

## I. INTRODUCTION

Plaintiff Suburban Trust and Savings Bank ("Suburban Trust" or "Bank"), an Illinois corporation, filed this diversity action on December 13, 1994, alleging breach of contract against defendant The University of Delaware ("University"), a Delaware corporation. Before the Court are the parties' cross-motions for summary judgment, Docket Items ("D.I.") 10, 33; the Court held oral argument in this matter on October 4, 1995. For the reasons set forth below, the Court will deny plaintiff's motion for summary judgment and grant defendant's motion for summary judgment. Jurisdiction is invoked pursuant to 28 U.S.C. § 1332; venue is proper under 28 U.S.C. § 1391(a).

## II. FACTUAL BACKGROUND

In 1993, the University of Delaware entertained bids from two vendors for the provision of round-the-clock, 7 day per week computer services. Affidavit of Victoria Windley, D.I. 25, Exh. 3. After some negotiation, the University agreed for these services to be provided by Enterprise Computer Services, Inc. Enterprise initially tendered a 36 month contract characterizing the service agreement as a lease; the contract also included a clause that provided that Enterprise could, without the University's consent, assign the contract to a third party. *Id.* After some negotiation, the terms were changed to reflect the contract's nature as a maintenance and service agreement, rather than a lease. The contract was also changed to provide that the contract could be assigned

only upon the mutual consent of both the University and Enterprise. *Id.* The parties consummated their agreement on June 16, 1993.

The maintenance contract obligated the University to pay Enterprise a monthly payment of $8,028 on the first day of each month, for 36 months, from July 1, 1993, to June 30, 1996. The contract also contained a waiver of defense clause, providing:

> All amounts payable by [the University] under this Agreement shall be absolute and unconditional and shall not be subject to any defense, setoff, counterclaim, or recoupment for any reason whatsoever, and such amounts shall be and continue to be payable in all events.

D.I. 25, Exh. 1, ¶ 3. The contract further provided that "[i]f an Enterprise Event of Default occurs, [the University] may, [sic] take action against Enterprise to the full extent provided by law." *Id.* at ¶ 10(b).

By the time the contract went into effect, July 1, 1993, the University paid the first payment of $94,409.28. This payment was an advance for maintenance services of an agreed list of computer equipment owned by the University. In addition, Enterprise was to "donate" and maintain one more processor to the University. *Id.*

During that summer, Victoria R. Windley, the University's Director of Purchasing, was approached by Jack McMahon of Harbor Capital about possible assignment of the University's payment obligations to a third party. *Id.* Accordingly to Windley, she inquired specifically about the ramifications of an assignment, *i.e.*, whether assignment would have any effect other than to merely change to whom the University would send payment for services provided. *Id.* An agreement was tendered notifying the University that Enterprise was granting a security agreement and assignment of the University contract to Suburban Trust and Savings. The assignment agreement included the following language:

> Customer [University], by signature below, acknowledges and agrees that: Customer's obligations to make all Payments under

the agreement and the rights of [Suburban Trust] in and to such amounts, shall be absolute and unconditional and shall not be subject to any abatement, reduction, setoff, defense, counterclaim or recoupment whatsoever. . . .

Notice and Agreement for Assignment of Enterprise Contract, D.I. 25, Exh. 2. Although this contractual language was contrary to her understanding of what the assignment meant, for reasons unknown, Windley signed the second agreement allowing assignment of the stream of payments to Suburban Trust. She now claims that she did not understand the agreement to mean that the University would have to pay even if Enterprise failed to provide the services it had agreed to furnish. D.I. 25, Exh. 3.

In the spring of 1994, the University learned that Enterprise was no longer a going concern and thus would not be providing further services to the University under its contract. *Id.* The University subsequently contracted with another vendor for computer maintenance services. *Id.*

Suburban Bank and Trust, as assignee, posits that under the terms of the assignment agreement, the University has an absolute obligation to continue payment on the Enterprise service contract. The Bank has prayed for damages in the amount of $187,-686.44 as the amount owed for the remaining months of service,[1] appropriate delinquency charges, and attorney's fees and costs.

## III. DISCUSSION

### A. Summary Judgment Standard—Cross Motions for Summary Judgment

Both sides have moved for summary judgment. Under the Federal Rules of Civil Procedure, the Court shall grant a motion for summary judgment if it determines "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden of demonstrating that it should prevail under Rule 56(c), see *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986), which can be accomplished by simply pointing out to the Court that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986); *see also Peters Township School Dist. v. Hartford Acc. & Indem. Co.*, 833 F.2d 32, 34 (3d Cir.1987). In opposition, the nonmoving party must come forward with evidence supporting a claim that there is a genuine issue of material fact in dispute which requires resolution by the trier of fact. *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968).

An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Material facts" are those which, under applicable substantive law, might affect the outcome of the case. *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir.1994) (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510). All reasonable doubts and inferences must be resolved in favor of the nonmoving party when reviewing each motion for summary judgment. "The nonmovant's allegations must be taken as true and, when these assertions conflict with those of the movant, the former must receive the benefit of the doubt." *Valhal Corp. v. Sullivan Assoc., Inc.*, 44 F.3d 195, 200 (3d Cir.1995) (quoting *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977)). In drawing these inferences, the Court may not make credibility determinations or weigh evidence. *Petruzzi's IGA Supermarkets v. Darling–Delaware*, 998 F.2d 1224, 1230 (3d Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993).

These standards do not change when the parties file cross motions for summary judgment. *Southeastern Pa. Transportation*

---

1. The contract contains a clause allowing acceleration of future payments, discounted at a rate of 5%, to become immediately due and payable in the event of a default by the University. D.I. 25, Exh. 1, ¶ 9(b).

*Auth. v. Pennsylvania Pub. Util. Comm'n,* 826 F.Supp. 1506, 1512 (E.D.Pa.1993), *aff'd mem.,* 27 F.3d 558 (3d Cir.1994), *cert. denied,* ——— U.S. ———, 115 S.Ct. 318, 130 L.Ed.2d 279 (1994). When faced with cross motions for summary judgment, the Court must consider the motions independently. *Williams v. Philadelphia Hous. Auth.,* 834 F.Supp. 794, 797 (E.D.Pa.1993), *aff'd mem.,* 27 F.3d 560 (3d Cir.1994). In short, the Court's inquiry for each motion is directed at "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2507.

### B. Choice of Law

■ As a threshold matter, a federal court sitting in diversity must address the issue of what law governs the rights and liabilities of the parties before it. In so doing, the Court looks to the substantive law of the forum state in which it sits, *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); the forum state's choice of law doctrine is included within its substantive law, *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Kruzits v. Okuma Machine Tool, Inc.,* 40 F.3d 52, 55 (3d Cir.1994). Because the issues at summary judgment turn on contract construction, the Court must examine Delaware's choice of law provisions for matters sounding in contract. Delaware has adopted the "most significant relationship test" as the choice of law rule relevant to the instant issues. *Travelers Indem. Co. v. Lake,* 594 A.2d 38 (Del.1991); *Oliver B. Cannon and Son, Inc. v. Dorr–Oliver, Inc.,* 394 A.2d 1160, 1166 (Del.1978).

■ In this case, however, the contract at issue contains language mandating that the agreement be "interpreted and the rights and liabilities of the parties hereto determined, in accordance with the internal laws of the State of Delaware." D.I. 1, Exh. A at ¶ 14(c); D.I. 25, Exh. 3 at ¶ 14(c). Delaware courts generally honor such provisions selected by contracting parties, so long as some material connection links the chosen jurisdiction to the transaction. *Wilmington Trust*

*Co. v. Wilmington Trust Co.,* 24 A.2d 309, 313 (Del.1942); *Cooper v. Ross & Roberts, Inc.,* 505 A.2d 1305, 1306 (Del.Super.Ct.1986). *See* Restatement (Second) of Conflict of Laws § 187 (1971). That connection is clearly present here because defendant is incorporated in Delaware. *See A.I.C. Ltd. v. Mapco Petroleum, Inc.,* 711 F.Supp. 1230, 1237 (D.Del.), *aff'd mem.,* 888 F.2d 1378 (3d Cir. 1989) (upholding similar choice of law provision when defendant was incorporated in Delaware). The Court therefore concludes that Delaware law applies to the contract issues in dispute.

### C. The Service Contract and the Assignment to Suburban Trust: Application of Article 9 of the Delaware's Enactment of the Uniform Commercial Code

Article 9 of the Uniform Commercial Code ("UCC"), as enacted by the Delaware legislature, applies to "any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including … accounts…." 6 *Del.C.* § 9–102. An account is defined as "any right to payment for … services rendered … whether or not it has been earned by performance." 6 *Del.C.* § 9–106. An account debtor is the person or entity obligated on an account. 6 *Del.C.* § 9–105(1)(a).

■ The assignment between Enterprise, as borrower of $173,188.22, and Suburban Trust, as lender, provides that "the Borrower hereby assigns to the Lender, and grants to the Lender a security interest in all the Borrower's right, title and interest in and to property ("Collateral") consisting of (i) the Service Agreement [between Enterprise and the University]." D.I. 1, Exh. B at ¶ 1. Because the Assignment between Suburban and Enterprise created a security interest in an account, *i.e.,* the right to receive the stream of payments for services rendered by Enterprise, Article 9 of the UCC governs this transaction. *See Mississippi Bank v. Nickles & Wells Constr. Co.,* 421 So.2d 1056, 1058–60 (Miss.1982) (en banc) (assignment by subcontractor to bank of its right to payment for services constituted security interest in the subcontract pursuant to Article 9); *First*

*Nat'l Bank v. Mountain States Tel. & Tel. Co.,* 91 N.M. 126, 571 P.2d 118, 120–21 (1977) (Article 9 applicable to assignment to bank of stream of payments for work rendered to telephone company).

Initially, the University argued that Article 9 does not apply to this case because its agreement with Enterprise was not one for a sale or lease of goods, but rather one for provision of services not governed by the UCC. However, the University now acknowledges[2] that section 9–102 goes on to say that:

> (3) The application of this Article to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this Article does not apply.

6 *Del.C.* § 9–102(3). In other words, even though Article 9 does not apply to the agreement between the University and Enterprise, it still governs by virtue of its application to the security agreement and assignment executed by Suburban Trust and Enterprise.

**1. Enforceability of the Waiver of Defense Clause**

■ Section 9–318 of Delaware Title 6 addresses the relationship between the assignee (Suburban Trust), the assignor (Enterprise), and the account debtor (the University). This provision "concerns the extent to which an assignee takes subject to the terms of the contract assigned and claims and defenses that may exist in favor of the account debtor." Hawkland, *Uniform Commercial Code Series,* § 9–318:01 (1993). Specifically,

> (1) Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in Section 9–206 the rights of an assignee are subject to
>
> (a) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; and

> (b) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment.

6 *Del.C.* § 9–318(1). The University argues that under this provision, Suburban Trust's rights are subject to all of the terms of the contract between the University and Enterprise, including any defenses or claims that may arise. In other words, Suburban Trust as assignee stands "in the shoes" of Enterprise, the assignor, unless section 9–206 applies.

In its motion for Summary Judgment, Suburban Trust argues for the application of Delaware's UCC section 9–206; the Bank views this statute as a decisive facet of its case. Section 9–206 provides:

> (1) Subject to any statute or decision which establishes a different rule for buyers or lessees of consumer goods, an agreement by a buyer or lessee that he will not assert against an assignee any claim or defense which he may have against the seller or lessor is enforceable by an assignee who takes his assignment for value, in good faith and without notice of a claim or defense, except as to defenses of a type which may be asserted against a holder in due course of a negotiable instrument under the Article on Commercial Paper (Article 3).

6 *Del.C.* § 9–206. When the University signed its agreement with Enterprise, it contracted that:

> the right of Enterprise's assignee ("Assignee") to receive [payment under the contract] shall not be subject to any defense, setoff, counterclaim, or recoupment which may arise out of any breach of any obligation of Enterprise or by reason of other indebtedness or liability at any time owing by Enterprise to [the University].

D.I. 25 Exh. 1.[3] According to Suburban Trust, pursuant to section 9–206, even if Enterprise may have defaulted on its obligation

**2.** *See* Transcript of Hearing, D.I. 31 at 44; D.I. 33.

**3.** The agreement executed by the University to allow assignment to Suburban Trust, D.I. 25, Exh. 2, contained a similar waiver of defense clause. Because the parties have both conceded, D.I. 30 at 48, that under 6 *Del.C.* § 9–318(4), a contractual term requiring consent to an assignment is ineffective, the Court focuses on the original agreement between Enterprise and the University.

to provide services, the University has waived its right to assert all defenses against the Suburban Trust. Under this reasoning, the University's waiver is valid and enforceable if Suburban Trust took the assignment in good faith and for value, without notice of any defense to be asserted by the University.

On the other hand, the University insists that section 9–206 does not apply to the waiver of defense clause in question, and thus the waiver of defense clause is not enforceable. By its explicit terms, section 9–206 applies to a "lessee" or "buyer," which under the UCC, generally includes buyers of goods, not services. *See, e.g.,* 6 *Del.C.* § 1–201(9) (buyer in the ordinary course of business is a buyer of goods); 6 *Del.C.* § 2–103(1)(a) (buyer is someone who buys or contracts to buy goods). Thus, because the University–Enterprise agreement was neither a lease nor a sale of goods, the University argues that any waiver of defense clause contained within the agreement is not enforceable under section 9–206.

The Bank has not been able to supply the Court with any authority holding a waiver of defense clause enforceable under 9–318(1) (and its cross reference to 9–206) as to account debtors other those who are buyers or lessees.[4] The University, on the other hand, has not pointed to any cases where a court has held that such a clause *is* enforceable against *only* such narrowly circumscribed account debtors. Independent legal research by the Court has similarly yielded no fruit. Suburban Trust, does, however, argue that two commentators have addressed this issue, both advancing a liberal approach embracing all account debtors as within the 9–318(1)'s purview. One commentator has remarked:

> Although UCC §§ 9–318(1) and 9–206(1) speak only of cutoff clauses arising out of sales and lease contracts, there is no policy reason why such clauses could not be used for real estate construction contracts or any other assignable agreement. The limited scope of the UCC language should be treated as a drafting error, and the courts

should by analogy extend the rationale to any agreement that may be the subject of an Article 9 assignment.

Barkley Clark, *The Law of Secured Transactions Under the Uniform Commercial Code,* ¶ 11.04[4], at 11–23 n. 70 (1993). Grant Gilmore, one of the Official UCC Advisors, expresses a similar view:

> There appears to be no reason whatever why a businessman, as distinguished from a consumer, should not have the capacity to waive his present or prospective defenses in favor of a financing assignee. It is clear enough that he can do this by executing a note or accepting a draft; there is no reason why he should not be able to do it by a contractual waiver. When the original purpose of § 9–206 (the protection of consumers) was abandoned, the rule that, except in consumer transactions, contractual waivers are effective should have been generalized so that it applied not only to "buyers" and "lessees" but to all "account debtors" and, so generalized, made a part of § 9–318. The present wording of the § 9–318(1) cross reference can unfortunately be read to mean that only "account debtors" who are buyers of goods can ever waive their contract defenses. The purpose of this tedious discussion is to suggest that such a senseless restriction was never intended and that the careless wording of the cross reference, to the extent it suggests such a restriction, should be disregarded.
>
> The affirmative provisions of § 9–206, which validate contractual waivers except in the area of consumer transactions, should be taken to apply, directly or by analogy, to all account debtors. The section is written in terms of present sales (and leases) of goods; however, if the language is read in a cheerful spirit, there is no insuperable difficulty in applying it to transactions which are not sales and leases. . . .

---

4. Neither party has argued that the University–Enterprise contract is one of a mixed nature, where the applicability of a UCC provision is decided by determining the proportion of the total contract price attributable to each of the goods and services aspects of the contract. D.I. 31 at 4; D.I. 24 at 8. *See also Glover School and Office Equip. Co. v. Dave Hall, Inc.,* 372 A.2d 221, 223 (Del.Super.Ct.1977).

Grant Gilmore, *Security Interests in Personal Property* § 41.5, at 1094–95 (1965).

█ The Court has carefully considered these scholarly treatises and recognizes that at least one UCC drafter, Gilmore, did not contemplate the scenario presented in the instant case. However, because the Court is faced with construction of Delaware's legislative enactment of its own version of the UCC, the Court must ultimately follow the mandate of the Delaware General Assembly. In construing Delaware statutes, Delaware courts have consistently followed the "plain meaning rule" of construction. *Turnbull v. Fink*, 668 A.2d 1370, 1378 (Del.1995). In its most recent articulation of this rule, the Supreme Court of Delaware has stated: "In the absence of any ambiguity, the language of the statute must be regarded as conclusive of the General Assembly's intent. The judicial role is then limited to an application of the literal meaning of the words." *Id.* (quoting *State v. Cooper*, 575 A.2d 1074, 1076 (Del. 1990) (citing *Evans v. State*, 516 A.2d 477, 478 (Del.1986)); *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, 492 A.2d 1242, 1246 (Del.1985)). *See also In re Adoption of Swanson*, 623 A.2d 1095 (Del.1993); *Moses v. Bd. of Educ.*, 602 A.2d 61 (Del. 1991).

The statute in question, 6 *Del.C.* § 9–318, is unambiguous on its face. Before Section 9–318(1) defines the rights of account debtors, it explicitly sets forth one qualification: The statutorily delineated rights are available to an account debtor "[u]nless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in Section 9–206...." 6 *Del.C.* § 9–318(1). Plaintiff would have the Court hold that waiver of defense clauses are enforceable against all Article 9 account debtors who agree not to assert defenses or claims. This construction would require, in effect, that the Court excise from the statute the phrase "as provided in Section 9–206." Given the plain terms of section 9–318(1), the Court is unwilling to venture down this interpretive path.

█ The Bank next argues that even if the waiver of defense provision is not enforceable under section 9–318, another sec-

tion permits the enforceability of this clause. Section 1–102 allows the parties to vary the effect of the UCC by agreement. The Delaware version of the UCC explicitly sets forth the legislature's underlying purpose and policy as follows:

(a) to simplify, clarify and modernize the law governing commercial transactions;

(b) to permit the continued expansion of commercial practices through custom, usage, and agreement of the parties;

(c) to make uniform the law among the various jurisdictions.

6 *Del.C.* § 1–102(2). To those ends, the statute continues by providing:

(3) The effect of provisions of this subtitle may be varied by agreement, except as otherwise provided in this subtitle and except that the obligations of good faith, diligence, reasonableness and care prescribed by this subtitle may not be disclaimed by agreement....

(4) The presence in certain provisions of this subtitle of the words "unless otherwise agreed" or words of similar import does not imply that the effect of other provisions may not be varied by agreement under subsection (3).

6 *Del.C.* § 1–102. Pursuant to section 1–102, the Bank contends that the University expressly agreed to waive its defenses against Suburban, in effect, varying from the provisions of section 9–318(1).

In the original contract between the University and Enterprise, the University agreed in paragraph ¶ 3 that all amounts due under the contract would be "absolute and unconditional and to subject to any defense, setoff, counterclaim, or recoupment for any reason whatsoever...." Further, during bargaining for this agreement, the University negotiated for and effected several contract revisions. Because the University apparently did not negotiate for removal or alteration of the waiver of defense provision, the Bank argues that the University fully assented to that contractual language.

█ In considering whether to apply section 1–102 as the Bank indicates, the Court is obligated, under settled principles of

Delaware law, to read the Commercial Code as a whole and harmonize the parts thereof. *Murphy v. Board of Pension Trustees,* 442 A.2d 950, 951 (Del.1982). Here, the two provisions differ in their applicability: Section 1–102 is general and applicable to an infinite number of potential commercial agreements under all of the Articles of the Code; section 9–318(1) is specifically geared toward a limited group of contracting parties, *i.e.,* account debtors whose status has arisen pursuant to a sales agreement governed by section 9–206, who have agreed to waive certain defenses. Where possible, Delaware courts endeavor to harmonize two potentially conflicting statutes dealing with the same subject. If the provisions cannot be reconciled, however, the specific statute must prevail over the general. *Turnbull,* 668 A.2d at 1376 (citing *Hamilton v. State,* 285 A.2d 807, 809 (Del.1971), and 2B *Sutherland Statutory Construction,* § 51.04 (5th ed. 1992)). Similarly, if the two statutes are irreconcilable, the later enacted statute must prevail over the earlier. *Turnbull,* 668 A.2d at 1376 (citing *State ex rel. State Highway Dept. v. George F. Lang Co.,* 56 Del. 126, 191 A.2d 322 (1963)).

Here, the above tenets of statutory construction all militate against allowing the general "var[y] by agreement" statute to prevail over the more specific provision. First, the Court recognizes that many sections of the Commercial Code include the term, "unless otherwise agreed." *See, e.g.,* 6 *Del.C.* §§ 2–210, 2–306, 9–112, 203. In those instances, it is clear that the legislature intended to allow the parties a "green light" to vary the terms of their agreement from the provisions of the Code. Thomas M. Quinn, 1 *Quinn's Uniform Commercial Code Commentary and Law Digest* at ¶ 1–102[A][3] (2d ed. 1991). Obviously, section 9–318 is not one of those sections. In other sections, the Code expressly alerts the reader that there is to be no allowable variation. *See, e.g.,* 6

*Del.C.* § 2–318 ("seller may not exclude or limit the operation of this section"). Other provisions of the Code give neither an explicit "green light" nor "red light" for such freedom of contract; they are silent on the question of variability. 1 *Quinn's Uniform Commercial Code Commentary* at ¶ 1–102[A][3].

In the Official Comment to section 1–102, the UCC itself offers guidance for application of this statute.[5] In Comment 2, the drafters defined (albeit loosely) the boundaries of allowable variance from the terms of the UCC. For example, parties could not vary nor change the meaning of explicitly defined terms under the Code. UCC § 1–102, Comment 2. The Comment also provides:

> [The] principle of freedom of contract is subject to specific exceptions found elsewhere in the Act and to the general exception stated here. The specific exceptions vary in explicitness: the statute of frauds found in Section 2–201, for example, does not explicitly preclude oral waiver of the requirement of a writing, but a fair reading denies enforcement to such a waiver as part of the "contract" made unenforceable. . . .

*Id.* Thus, the Official Comment deems section 2–201 as flashing an implicit "red light." Section 2–201 reads, "Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made. . . ." 6 *Del.C.* § 2–201(1). This same statute then provides specific examples of when deviation from the general provision will be statutorily tolerated. *See e.g.* § 2–201(3) (enforceable if goods are specially manufactured for the buyer and not suitable for sale to others).

The Court views § 9–318(1) in a similar vein. Section 9–318(1) expressly delineates only one specific exception from its general

**5.** In construing Delaware's Commercial Code, Delaware courts have commented that the Official Comments prepared by the drafters of the UCC are useful in interpreting the Code as it is to be applied in Delaware. *Acierno v. Worthy Bros. Pipeline Corp.,* 656 A.2d 1085, 1090 (Del.1995); *In re Copeland,* 531 F.2d 1195, 1203 n. 4 (3d Cir.1976). The Court also notes that section 1–

103 is taken directly from the analogous provision in the Uniform Commercial Code. Additionally, Delaware's section 1–103 has not been amended since originally enacted; thus, there is no possibility that superseding enactments give the Court pause in according the Official Comment the considerable weight it deserves. *Acierno,* 656 A.2d at 1090.

treatment of the rights of an assignee, *i.e.,* account debtors whose status has arisen pursuant to a sales agreement governed by section 9–206. To allow parties to vary their contractual terms beyond the scope of the legislated exception would do violence to that very limitation. Although freedom of contract is solidly set in the Code, section 9–318 is one example of where the legislature has set in place a safety device or control mechanism designed to lessen the danger of possible injury to the unsuspecting. *See* 1 *Quinn's Uniform Commercial Code Commentary* at ¶ 1–102[A][3]. This policy consideration is especially compelling where, as the Bank admits, waiver clauses are "extremely rare" between an account debtor and the assignor when the right assigned is an account. D.I. 28 at 4. *See also* 9 William D. Hawkland, *et al., Uniform Commercial Code Series* at § 9–318:02 (1993). Accordingly, the Court holds that the University could not be deemed to have varied its rights with respect to the waiver of defense clause.

In its remaining argument, the Bank maintains that section 1–103 allows for the common law to supplant the Commercial Code. "Unless displaced by the particular provisions of th[e] Act, the principles of law and equity ... shall supplement its provisions." 6 *Del.C.* § 1–103. The Bank then cites several authorities for the proposition that "common law will apply unless the Code contains an *express* provision contrary to a prior rule of law.... *[A] statute will not be construed so as to overrule a principle of established common law, unless it is made plain by the fact that such a change in the established law is intended.*" D.I. 34 at 2 (emphasis supplied by plaintiff) (internal citations omitted). The Court is willing to assume *arguendo* that the Bank has correctly stated the Delaware view on section 1–103.

■ The Court, however, parts company with the Bank over the Bank's next assertion: that section 9–318(1) does not prohibit the enforceability of a waiver of defense clause where the security interest is in an account that has not arisen under 9–206. As discussed above, the Court finds that section 9–318(1) does expressly limit the class of account debtors against whom a waiver of

defense clause may be enforced to those account debtors who fall within the purview of section 9–206. Consequently, as the Court has held that section 9–318(1) applies to the instant parties and explicitly qualifies the allowable enforcement of waiver of defense clauses, the Court also finds section 9–318 of the Delaware Commercial Code to expressly displace common law on this issue. Therefore, the Court will not look past the Commercial Code to other "principles of law and equity."

■ In sum, the Court notes that "[a] Legislature is presumed to be aware of existing law." *Giuricich v. Emtrol Corp.,* 449 A.2d 232, 239 n. 13 (Del.1982) (citations omitted). At the time of enactment of the UCC in Delaware, although the Delaware courts had not spoken on the issue of enforceability of waiver of defense clauses, Delaware common law did presume that "freedom of contract is the rule and restraints on this freedom the exception, and to justify this exception unusual circumstances should exist." *State v. Tabasso Homes,* 28 A.2d 248, 252 (Del.Ct.Gen.Sess.1942). In addition, other jurisdictions gave effect to such waiver provision as well. *See, e.g., Straight v. James Talcott, Inc.,* 329 F.2d 1 (10th Cir.), *cert. denied,* 379 U.S. 822, 85 S.Ct. 44, 13 L.Ed.2d 33 (1964); *Walter J. Hieb Sand & Gravel, Inc. v. Universal C.I.T. Credit Corp,* 332 S.W.2d 619 (Ky.1959). Under these circumstances, the legislature must be presumed to have known that the common law would likely recognize waiver of defense provisions.

■ Further, the Delaware General Assembly is presumed to have acted intentionally when it expressly included or omitted a provision in a statute. *Giuricich,* 449 A.2d at 238. "We may not assume that the omission was the result of an oversight on the part of the General Assembly.... The courts may not engraft upon a statute language which has been clearly excluded therefrom by the Legislature." *Id.* A careful reading of Article 9 reveals that the legislature included service agreements in various sections of its enactment of Article 9 (*e.g.,* 6 *Del.C.* § 9–106), but did not include them in section 9–206. Under *Giuricich,* the omission must be presumed intentional.

Additionally, the Court notes that above-cited commentaries by Grant Gilmore and Barkley Clark, both criticizing section 9–318(1)'s limitation of enforceability of waiver of defense clauses, have been on record since 1965 and 1980, respectively. The Delaware General Assembly has amended section 9–318 twice since originally enacted in 1967: once in 1983 and again in 1992. *See* 64 Del.Laws Ch. 152, § 7; 68 Del.Laws Ch. 249, § 5. Notwithstanding the scholarly commentary that the provision contains a drafting error, the Delaware legislature, in amending the statute twice, did nothing to correct any so-called "mistake" it may have made in the first enactment.

## IV. CONCLUSION

In sum, the Court declines to engraft any common law expansion of legal principles onto the rules of commercial transactions as enacted by Delaware's legislative body. To do so would be impermissible under Delaware law. *Giuricich,* 449 A.2d at 238. Therefore, the Court holds as unenforceable the waiver of defense clause contained in the service agreement entered into by the University in this case. Because the Court will not give effect to such clauses, and because the Court holds section 9–318 as governing the rights and liabilities of the instant parties, Suburban Trust is deemed to stand in the shoes of the assignor, Enterprise. Under this agreement, in the event of default by Enterprise the University is allowed to take action against Enterprise to the full extent provided by law.

■ It is a general rule of contract law that a total breach of the contract by one party relieves the injured party of any further duty to perform further obligations under the contract. *Hudson v. D & V Mason Contractors, Inc.,* 252 A.2d 166, 170 (Del.Super.Ct.1969); Arthur Linton Corbin, 4 *Corbin on Contracts* § 946 (1951). Because Enterprise has materially breached its obligation of performance, the University is justified in withholding further payment under

principles of contract law. The Court therefore holds that the University is not in default of its payment obligation to Suburban Trust. Accordingly, the Court will grant the University's motion for summary judgment and deny Suburban Trust's motion for summary judgment.[6]

---

6. Because the Court will grant defendant's motion for summary judgment, it will not treat grounds urged by the defendant in opposition to plaintiff's motion for summary judgment, other than to note that these arguments (*e.g.,* right of rescission, notice of default, misrepresentation) have no merit.